**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

UNITED STATES OF AMERICA

              v.

MATTHEW BRENT GOETTSCHE,
[DEFENDANT TWO REDACTED],
JOBADIAH SINCLAIR WEEKS,
JOSEPH FRANK ABEL, and
SILVIU CATALIN BALACI

Hon. Claire C. Cecchi

CRIMINAL NO. 1:19-cr-877-CCC

**Oral Argument Requested**

**DEFENDANT MATTHEW BRENT GOETTSCHE'S**
**MOTION FOR REVOCATION OF PRETRIAL DETENTION ORDER**

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

PROCEDURAL HISTORY ...............................................................................................2

LEGAL FRAMEWORK ...................................................................................................3

I.   Because the Government Has Not Met Its Dual Burden to Support Detention,
     the Court Must Release Mr. Goettsche on Appropriate Conditions. ...................5

     A. Mr. Goettsche's History and Characteristics Show That He Is Not
        a Serious Flight Risk.......................................................................................5

        1.   Alleged Family Member Conduct......................................................7

        2.   Mr. Goettsche's Application for St. Kitts Economic Citizenship
             and International Travel......................................................................9

        3.   The Bombardier N357TC.................................................................14

        4.   Mr. Goettsche's Assets ....................................................................15

     B. The Nature and Circumstances of the Offense Do Not Warrant Pretrial Detention. .........18

II.  Proposed Bail Package........................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Herzog v. United States,*
   75 S. Ct. 349 (1955) ................................................................................................4

*United States v. Alston,*
   420 F.2d 176 (D.C. Cir. 1969) ................................................................................4

*United States v. Benhamou,*
   No. 11-CR-336 (S.D.N.Y. Nov. 17, 2010) .......................................................14, 16

*United States v. Bodmer,*
   2004 WL 169790 (S.D.N.Y. Jan. 28, 2004) ...............................................13, 16, 19

*United States v. Berrios-Berrios,*
   791 F.2d 246 (2d Cir. 1986) .....................................................................................20

*United States v. Cirillo,*
   No. 99-1514, 1999 WL 1456536 (3d Cir. July 13, 1999) .................................3, 4, 6

*United States v. Dreier,*
   596 F. Supp. 2d 831 (S.D.N.Y. 2009) ......................................................................18

*United States v. Griffith,*
   No. 1:20-CR-15 (S.D.N.Y. December 30, 2019) .......................................11, 13, 16

*United States v. Hansen,*
   108 F. App'x 331 (6th Cir. 2004) .....................................................................13, 16

*United States v. Harry,*
   No. 19-CR-246 (D.N.J. 2019) ...........................................................................12, 16

*United States v. Himler,*
   797 F.2d 156 (3d Cir. 1986) .................................................................................1, 4

*United States v. Lopez,*
   827 F. Supp. 1107 (D.N.J. 1993) ..........................................................................5, 6

*United States v. Madoff,*
   1:09-CR-213 (SDNY January 16, 2009) .................................................................18

*United States v. Motamedi,*
   767 F.2d 1403 (9th Cir. 1985) ...................................................................................4

*United States v. Sabhnani,*
   493 F.3d 63 (2d Cir. 2007) ....................................................................................3, 4

*United States v. Salerno*,
    481 U.S. 739 (1987)................................................................3

*United States v. Santos-Flores*,
    794 F.3d 1088 (9th Cir. 2015) ..................................................4

*United States v. Shakur*,
    817 F.2d 189 (2d Cir. 1987).....................................................3

*United States v. Sharma*,
    No. 1:18-CR-340 (S.D.N.Y. April 25, 2018, July 31, 2018)..................16

*United States v. Webb*,
    No. 15-CR-252 (PKC) (E.D.N.Y.) ........................................13, 16

**Statutes**

18 U.S.C. § 371 ..........................................................................2

18 U.S.C. § 1349 ........................................................................2

18 U.S.C. § 3142(c)(1)(B) ...........................................................3

18 U.S.C. § 3142(e) ................................................................1, 20

18 U.S.C. § 3142(f) .....................................................................1

18 U.S.C. § 3142(g)(3)(A)............................................................5

18 U.S.C. § 3146(b)......................................................................4

18 U.S.C. § 3181 .......................................................................17

Extradition Treaty, U.S.-Belize, Mar. 30, 2000, TIAS 13089......................17

Extradition Treaty, U.S.-Costa Rica, Dec. 4, 1982, TIAS...........................17

Extradition Treaty, U.S.-St. Kitts & Nevis, Sept. 18, 1996, TIAS 12805.............11, 17

Defendant Matthew Goettsche respectfully moves the Court to revoke Magistrate Judge Mix's detention order, entered on December 13, 2019, in the District of Colorado (D. Colo. Dkt. No. 1:19-mj-277 (NYW)).  Mr. Goettsche poses neither a danger to the community nor a serious risk of flight.  Below, Mr. Goettsche responds to the allegations raised by the government in its written motion for detention before the District of Colorado (Ex. A), which he was not able to do in advance of that hearing, as well as arguments raised orally at his initial detention hearing (Ex. B).  The facts establish that there is no serious risk of flight and any general risk associated with defendants of means similarly situated to Mr. Goettsche is amply mitigated by the proposed conditions of release.  Accordingly, Mr. Goettsche requests release on such conditions pending trial.

## INTRODUCTION

The Bail Reform Act requires the Court to release Mr. Goettsche unless the government proves by a preponderance of the evidence that he poses a serious risk of flight and that there are no conditions or combination of conditions that will reasonably assure his appearance.  *United States v. Himler*, 797 F.2d 156, 161 (3d Cir. 1986); 18 U.S.C. § 3142(e).  There is no presumption of detention in this case and there is no suggestion that release would pose any danger to the community.[1]  Accordingly, the sole issue for the Court is whether the government has met its burden of establishing (1) that Mr. Goettsche poses a serious flight risk and (2) that there are no conditions of release that can reasonably assure his appearance at his court dates.

---

[1] Although the government says in its written motion that Mr. Goettsche may pose a danger to the community because he could engage in another fraudulent scheme, *see* Ex. A at 26, it abandoned the argument at the first detention hearing.  *See* Ex. B.  The Bail Reform Act delineates those crimes that may support a detention hearing for danger to the community; no such crime of violence is alleged in this case and there is no criminal history here, let alone a violent one.  *See* 18 U.S.C. § 3142(f); *Himler*, 797 F.2d at 160.

The government fails on both counts.  Other than being a person of means, Mr. Goettsche is not a flight risk, let alone a serious one, and the proposed conditions of release provide more than reasonable assurance that he would not and could not flee.  In light of Mr. Goettsche's deep contacts in Colorado – where he has lived nearly his entire life, and where he, his wife and children, his mother and in-laws reside – a comprehensive bail package including home confinement, GPS monitoring, a substantial bond secured by unencumbered property, and co-signatures from other family members would reasonably assure his appearance at future proceedings.

Additionally, releasing Mr. Goettsche will allow him to meaningfully participate in his defense.  This case involves an enormous amount of discovery seized from Mr. Goettsche and various businesses that relates to the digital currency industry, which no one disputes is extraordinarily complex.  Reviewing that discovery, understanding it, and adequately preparing for trial will require a deep understanding of BitClub Network's business, digital currency mining, and the digital currency transactions at issue.  It would be extremely challenging for Mr. Goettsche to meaningfully assist counsel in understanding these transactions if he were forced to do so from a jail cell in New Jersey.  His assistance is even more necessary here than in virtually any other type of white collar case, given that there are fewer experts in digital currency than in other, longer-established industries.

## PROCEDURAL HISTORY

Mr. Goettsche was indicted on December 5, 2019, along with five other individuals, for (1) conspiracy to commit wire fraud, pursuant to 18 U.S.C. § 1349, and (2) conspiracy to offer and sell unregistered securities, pursuant to 18 U.S.C. § 371.  At the time of Mr. Goettsche's arrest in Erie, Colorado, on December 10, 2019, federal agents seized Mr. Goettsche's electronic

devices, which severely limited counsel's access to relevant information at the initial detention hearing in Colorado.

On December 13, 2019, Mr. Goettsche appeared before U.S. Magistrate Judge Mix in the District of Colorado for a detention hearing. The government filed a written memorandum in support of detention a few hours before the hearing (*see* Ex. A), to which defense counsel did not have an opportunity to file a written response. At the end of the hearing, Judge Mix ordered Mr. Goettsche detained, but recognized "I know you will be addressing this issue[] in New Jersey." Judge Mix then ordered that Mr. Goettsche be transported to this district. *See* Ex. B at 57 (Tr. of Dec. 13, 2019 Det. Hr'g).

Mr. Goettsche arrived in the District of New Jersey on or about January 7, 2020. He was arraigned on January 15, 2020, and entered a plea of not guilty.

## LEGAL FRAMEWORK

The Bail Reform Act requires courts to release defendants "subject to the least restrictive . . . condition, or combination of conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B). "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). "Under this statutory scheme, 'it is only a 'limited group of offenders' who should be denied bail pending trial.'" *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007) (quoting *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987)).

"A defendant may not be detained pending trial unless 'no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community.'" *United States v. Cirillo*, No. 99-1514, 1999 WL 1456536, at *1 (3d Cir. July 13, 1999) (quoting 18 U.S.C. § 3142(e)). "Because the law thus generally favors

bail release, the government carries a dual burden in seeking pre-trial detention." *Sabhnani*, 493 F.3d at 75. First, the government must establish by a preponderance of the evidence that the defendant presents a serious risk of flight. *Himler*, 797 F.2d at 161. Second, if this burden is satisfied, the government must then demonstrate by a preponderance of the evidence that "no condition or combination of conditions will reasonably assure" his presence in court. *See id.* at 160–61; *Cirillo*, 1999 WL 1456536, at *1.

"Judicial officers making risk of flight determinations are guided by the factors set forth in Section 3142(g), including the nature and circumstances of the offense charged, the weight of the evidence against the person, and the history and characteristics of the defendant." *Himler*, 797 F.2d at 161 (reversing magistrate judge's detention order and risk of flight determination) (citing 18 U.S.C. § 3142(g)). The "'weight of the evidence' is the least important of the various factors." *United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985); *see also Cirillo*, 1999 WL 1456536, at *1 (releasing defendant over government objection where weight of the evidence was the only factor in support of detention). "It is true, of course, that 18 U.S.C. § 3146(b) requires the court to take into account 'the nature and circumstances of the offense charged (and) the weight of the evidence against the accused,' but the statute neither requires nor permits a pretrial determination that the defendant is guilty." *United States v. Alston*, 420 F.2d 176, 179 (D.C. Cir. 1969). "Only in rare cases should release be denied, and doubts regarding the propriety of release are to be resolved in favor of the defendant." *United States v. Santos-Flores*, 794 F.3d 1088, 1090 (9th Cir. 2015); *see also Motamedi*, 767 F.2d at 1405. As the Supreme Court has mandated, "[d]oubts whether [bail] should be granted or denied should *always* be resolved in favor of the defendant." *Herzog v. United States*, 75 S. Ct. 349, 351 (1955) (emphasis added).

This Court reviews the District of Colorado's determination of detention *de novo.  United States v. Lopez*, 827 F. Supp. 1107, 1111–12 (D.N.J. 1993).

**ARGUMENT**

**I.      Because the Government Has Not Met Its Dual Burden to Support Detention, the Court Must Release Mr. Goettsche on Appropriate Conditions.**

The evidence the government has proffered does not prove by a preponderance of the evidence that Mr. Goettsche would flee the country or otherwise fail to appear for trial.  To the contrary, the facts show that he is not a flight risk and release is warranted.

**A.      Mr. Goettsche's History and Characteristics Show That He Is Not a Serious Flight Risk.**

Mr. Goettsche's history and characteristics, including his uncommonly strong family and community ties, weigh heavily in favor of release on conditions.  *See* 18 U.S.C. § 3142(g)(3)(A). Mr. Goettsche has lived nearly his entire life within a few miles of Boulder, Colorado, where he attended Heatherwood Elementary, Platt Middle School, Fairview High School, and the University of Colorado at Boulder.  He met his wife when they were children; Ms. Goettsche's father coached Mr. Goettsche's baseball team, and her older brother was Mr. Goettsche's teammate.  The two began dating in 1999, when they were both in high school.  They married in 2006 in Colorado and have built their life together in Colorado.  Mr. and Ms. Goettsche lived in the same house in Erie, Colorado, from 2009 to 2017, before moving to their current home six miles away in Lafayette, Colorado.  Their three children (ages 3, 5, and 8) have lived in Colorado their whole lives.

Mr. Goettsche has extensive family ties to Colorado in addition to his wife and three children.  Mr. Goettsche's mother lived at the same house in Boulder from roughly 1987 through 2014.  After Mr. Goettsche's father died in a plane accident in 1993, when Mr. Goettsche was 11, his mother eventually remarried and now lives with her middle-school aged child about a 5-

5

minute drive from Mr. Goettsche's home.  Mr. Goettsche's mother and her husband are very

active in the church and its community, attending services nearly every week in Louisville,

Colorado.

Mr. Goettsche's wife likewise has spent her entire life near Boulder, Colorado, and has

extensive family ties to Colorado.  She attended school near Boulder and many of her and Mr.

Goettsche's longtime friends remain close by.  Her parents live less than 10 minutes away and

her extended family, with whom she is close, live about 45 minutes away.

Mr. and Ms. Goettsche are as integrated into their community as a couple can be,

evidencing even stronger ties than the average long-term resident.  Mr. and Ms. Goettsche are

actively involved in their children's local school activities.  Mr. Goettsche coaches his son's

sports teams, including youth basketball, soccer, baseball and flag football.  Ms. Goettsche

started a charity that raises money for pediatric cancer, MySunshine Foundation, and both Mr.

and Ms. Goettsche serve on its board.  Mr. Goettsche is also actively involved in a foundation

that raises money for pediatric cancer, mental health services and ocean conservation.

Courts in this district and elsewhere routinely grant bail in cases where the accused has

family and community ties to the United States far less extensive than Mr. Goettsche's.  *See, e.g.*,

*Cirillo*, 1999 WL 1456536, at *2 ("Cirillo's strong family ties, lack of a prior criminal record,

employment in a well-established family business, alleged commission of a nonviolent crime . . .

support the Magistrate Judge's conclusion that his appearance at trial can be reasonably assured.

This is particularly true given his family's willingness to secure his release through a mortgage

against their home, worth an estimated $200,000, and a pledge of the substantial (over $500,000)

assets of their business."); *Lopez*, 827 F. Supp. at 1111–12 (Wolin, J.) (vacating detention order

and setting conditions of release because "the government has failed to meet its burden of

showing by a preponderance of the evidence that defendant will not appear at trial if released as required under section 3142").

Indeed, the government does not dispute Mr. Goettsche's extensive ties to Colorado, but urges that certain factors nonetheless warrant detention. They do not. Some of the factual assertions made by the government to the court in Colorado in support of its request for detention pending removal to New Jersey were inaccurate or incomplete and, in reality, do not support detention at all. Viewed in the proper context, those same facts support release pending trial.

### 1.   Alleged Family Member Conduct

The government characterizes the attitude of uncharged family members after Mr. Goettsche's arrest to insinuate that he presents a flight risk. First, the government's written motion for detention claims that Mr. Goettsche's mother "appeared to be hesitant" when numerous federal agents showed up at her door unannounced, at 7:15 a.m., with no warrant or subpoena, and asked to speak with her other son, Michael Goettsche, who was sleeping. Ex. A at 17. The government asserted, and presumably will continue to assert, that this vague and unremarkable observation that she "appeared to be hesitant" supports its motion that the defendant himself is a flight risk.

Even if the assertion of a "hesitancy" by Mr. Goettsche's mother when approached by federal agents early in the morning could somehow support an inference of risk of flight against Mr. Goettsche, the government omitted several significant details that put the encounter in proper context. When law enforcement first arrived at her home around 7:15 a.m., Mr. Goettsche's mother promptly answered the door and spoke to the agents for about ten minutes, although she was under no obligation to do so. Approximately fifteen minutes after those agents left, different agents knocked on the door and, also without a warrant or subpoena, asked that

Michael Goettsche voluntarily come speak to them.  Mr. Goettsche's mother complied with the agents' request to wake up her son, who got dressed and voluntarily went to the door.

Not only would "hesitancy" – whatever the government means by it – be entirely reasonable (and benign) by anyone in that circumstance, the reaction of his mother does not bear in any way on Mr. Goettsche's risk of flight.  Ironically, if Mr. Goettsche's mother or brother had politely said to the agents "I would like to speak to a lawyer before speaking to you," the government would not have been able to mention it in their motion without trampling on the Constitution.  Yet, the government has turned a situation where it received voluntary cooperation from Mr. Goettsche's family members, without a request for an attorney, into an argument that Mr. Goettsche himself is a risk of flight due to his mother's "hesitancy."

The government also asserts in its motion that the brother, Michael Goettsche, may have been involved in the allegations underlying the indictment, although he has not been charged, citing to handwriting on a whiteboard allegedly stating "It's ok to take advantage."  *See* Ex. A at 16.  Whatever those words might mean, they do not reflect in any way whatsoever on whether Michael (who remains uncharged) would be a flight risk if he were charged, let alone whether the defendant is a risk of flight.

Last, the government claimed in its motion that Mr. Goettsche "directed" his wife to call "subject 1" as he was being arrested.  Ex. A at 17.  The government then alleges that after this phone call, "subject 1," who was speaking to law enforcement voluntarily in another location, "ended the interview" with the agents.  *Id.*  These two factual assertions, strung together, appear to be intended to cause the court in Colorado to conclude that Mr. Goettsche's wife asked subject 1 not to voluntarily speak with the agents and did so at the defendant's request.  *See id.*  Again, however, the government omits key facts (of which it is aware) that lead to a different conclusion.

For example, as the agents were arresting Mr. Goettsche, he said he would like to call his lawyer.  Mr. Goettsche asked his wife to call his accountant to let him know what was happening, and to ask him to contact a lawyer on Mr. Goettsche's behalf.  This accountant is "subject 1" in the government's motion.  If the government had information that Ms. Goettsche asked subject 1 to stop speaking to the agents (or more importantly that the defendant told his wife to do so), the government would certainly have said so.  Instead, the government let its two factual assertions give the impression to the court in Colorado that such was the case when it knew that the instruction to contact subject 1 was to help find him a lawyer.  Subject 1's apparent decision to terminate the voluntary interview, assuming he did terminate it, upon learning from Ms. Goettsche that Mr. Goettsche had been arrested (something the agents apparently had not told him) does not support the insinuation by the government that Ms. Goettsche tried to dissuade her husband's CPA from speaking voluntarily with law enforcement.  And, regardless, it does not suggest in any way that Mr. Goettsche is a risk of flight.

Each of these assertions about Mr. Goettsche's family members made by the government to support its motion for detention, when put in their proper context, lend no support to the claim that Mr. Goettsche is a risk of flight.

> 2.  *Mr. Goettsche's Application for St. Kitts Economic Citizenship and International Travel*

The government also argued that Mr. Goettsche is a flight risk because he applied for citizenship to St. Kitts and because he was a frequent international traveler.  Ex. A at 22-26. However, neither argument is persuasive.

In May 2017, two and a half years before his arrest and long before he could have been aware of a criminal investigation, Mr. Goettsche applied to St. Kitts for citizenship by

investment.[2]  After owning a vacation timeshare in St. Kitts for the requisite amount of time, Mr. Goettsche applied for citizenship for his family.

It is common for U.S. citizens working in the digital currency industry to obtain dual citizenship.  The reason for this is simple, non-nefarious and well known: many foreign-based digital currency exchanges, mining companies and other industry participants choose not to do business with U.S. citizens because of the lack of development of U.S. law and regulations regarding digital currency.  The literature and media in the digital currency space has focused often on this issue.  For example, in an article entitled "US a Crypto Exchange Scarecrow – What Needs to Change?" published by cointelegraph.com, author Simon Chandler writes:

> "America is the land of opportunity, so long as you don't happen to be a cryptocurrency exchange.  For several years now, a number of prominent exchanges have opted not to serve U.S. citizens; in fact the list of trading platforms avoiding the U.S. is still growing with Bancor recently announcing that it would block U.S. citizens from using its website to convert tokens. As can be guessed, regulation – or the lack of clear regulation – is the main reason why crypto exchanges are increasingly shying away from the U.S. exchanges [and] complain about the uncertainty of U.S. Securities legislation, about the failure of legislators to respond quickly to the rise of crypto with corresponding laws and about haw the lack of transparent regulatory framework is putting America's domestic cryptocurrency industry at a competitive disadvantage.

Consistent with the general reasons above for why some U.S. citizens in the digital currency industry seek a second citizenship, for Mr. Goettsche, a second citizenship would allow him to use foreign digital currency exchanges to exchange digital currency into fiat currency

---

[2] The government of St. Kitts and Nevis has a long running "Citizenship-by-investment" program for applicants who make a substantial contribution to the development of the country.  *See* St. Kitts and Nevis Citizenship, *available at* http://stkitts-citizenship.com.  An applicant is required to make a minimum real estate investment of $200,000 held for 7 years or $400,000 held for 5 years in order to qualify for citizenship.  *Id.*  The application process is rigorous: applicants must submit to an FBI background check, undergo a medical exam, and submit original birth certificates, marriage certificates and reference letters. *See* FAQ "What documents are needed?" *available at* http://stkitts-citizenship.com/faqs/.

(cash) in order to pay vendors for his company's operational expenses, such as the enormous electricity bills associated with data centers, and to pay for the set-up of new centers. Many U.S.-based digital currency exchange services shut down over time or have monthly exchange limits, making them less than ideal to use for ongoing business purposes. Having a second citizenship in St. Kitts, for example, would help diversify exchange service options.

In addition to the fact that application for dual citizenship in the digital currency industry is common and not evidence of intent to flee, his application was still incomplete when he was arrested in December 2019 and, when the government raised the applications in support of its request for detention, Mr. Goettsche withdrew his application on December 12, 2019. *See* Ex. C.

Most importantly, St. Kitts has a bilateral extradition treaty with the United States, making it an undesirable destination for anyone intending to flee prosecution in the United States. *See* Extradition Treaty, U.S.-St. Kitts & Nevis, Sept. 18, 1996, TIAS 12805. In other words, applying for citizenship in St. Kitts is not evidence of intent to flee from U.S. prosecution and is therefore not a factor that should be considered by this Court as indicating a risk of flight under the Bail Reform Act. *See United States v. Griffith*, No. 1:20-CR-15 (S.D.N.Y. December 30, 2019) (extradition treaty with St. Kitts, where defendant contemplated moving, considered in favor of release).

Nor does Mr. Goettsche's frequent international travel indicate any risk of flight from prosecution, much less warrant detention, given its prevalence in today's modern, global economy. *See* Ex. A at 23-25. Indeed, the international trips the government has pointed to involve either family vacations or legitimate business functions. Of the nearly 40 trips the government lists in its motion, 24 were for family vacations, nine were for the purposes of purchasing mining equipment to support BitClub Network's mining operations or to visit a BitClub Network datacenter, and the remainder were for other business purposes. The majority

of the family's vacations were to the same location in Belize, which is their favorite getaway with their children and is a short flight from Denver.[3]  Trips to Germany were to meet with Genesis Mining, the biggest bitcoin mining company in the world, or to set up a new blockchain technology company.  There is simply nothing nefarious about frequent international travel, nor does it reflect a likelihood of future flight in any way, especially given that the government's chart shows that Mr. Goettsche returned home each time to Colorado after only a short time away.

Courts regularly grant bail despite extensive foreign ties, including business interests and travel, even for foreign nationals charged in the U.S. and defendants from other states.  In *United States v. Harry*, Magistrate Judge Dickson denied a motion for pretrial detention, in another case alleging a large fraud, based on the defendant's strong family ties and longstanding residence in Florida.  No. 2:19-CR-246, Dkt. No. 85 at 6 (D.N.J. Nov. 15, 2019) (attached as Ex. D).  The defendant was charged with "orchestrating and participating in a massive fraud scheme involving, potentially, hundreds of millions of dollars."  *Id.* at 6.  Despite agreeing with the government that the defendant presented a "high risk" of flight because he was a dual citizen of the U.S. and Canada, had significant foreign ties, foreign travel, business dealings abroad, and was comfortable "living abroad," Judge Dickson found that there were release conditions that would minimize any risk.  *Id.* at 4, 5.  Judge Dickson credited that the defendant lived at the same address in Florida for over 15 years, "has been an active member of his community," and has "strong familial ties in Florida, including four children who reside with him part-time."  *Id.* at 6.  The release conditions included a $2.5 million bond co-signed by others and secured by

---

[3] The Caribbean island of Belize is about a four hour flight from Colorado.  Known for its beautiful beaches and with English as the primary language, 75% of tourists to Belize are from the United States.

three pieces of real estate, home confinement, a third-party custodian, limited travel and surrender of the defendant's and his children's passports. *Id.* at 10-11.

Similarly, in *United States v. Griffith*, the court reversed the detention of the defendant, a citizen of the United States and Singapore, who was accused of conspiracy to evade sanctions in connection with a digital currency-related scheme involving the North Korean government, and had contemplated St. Kitts citizenship. No. 1:20-CR-15, Dkt. No. 12 at 19 (S.D.N.Y. December 30, 2019) (attached as Ex. E). Explicitly recognizing the defendant's family ties and St. Kitts' extradition treaty with the United States, the court released him over government objection, with a $1 million bond secured by his family and two of their homes, strict pretrial supervision, restricted travel, and home detention and electronic monitoring in Alabama. Ex. E at 19, 33-36, 40.

Courts have even released defendants and allowed them to return to their residences outside the U.S. pending trial. For example, the Sixth Circuit affirmed the lower court's release of a Danish citizen and resident charged with bulk-cash smuggling, permitting him to stay in Denmark pending trial. *United States v. Hansen*, 108 F. App'x 331 (6th Cir. 2004). And in the highly publicized FIFA corruption cases in the Eastern District of New York, the vast majority of the 18 defendants who appeared—almost all of whom were foreign nationals and many of whom had multiple citizenships outside the U.S.—were granted bail over the government's objection. *See generally, United States v. Webb*, No. 15-CR-252 (PKC) (E.D.N.Y.).

The strong presumption in favor of release has even led courts to grant bail for defendants who are foreign nationals and whose home countries do not extradite their own citizens. For example, a wealthy Swiss national charged with bribery and money laundering offenses in connection with Azerbaijani oil transactions was granted bail over the government's objection and permitted to reside with friends in the District of Columbia pending trial. *United*

*States v. Bodmer*, No. 03-CR-947 (SAS), 2004 WL 169790, at *1 (S.D.N.Y. Jan. 28, 2004).

Similarly, a wealthy French national charged with insider trading was granted bail over the

government's objection and ordered to rent a suitable apartment in New York City.  *United*

*States v. Benhamou*, No. 11-CR-336, Dkt. Entry for November 17, 2010 (S.D.N.Y. Nov. 17,

2010).  Neither of these defendants was a U.S. resident and both were citizens of countries that,

as a matter of law, did not extradite their own nationals.

Mr. Goettsche's U.S. citizenship and deep ties to this country, particularly in Colorado,

strongly support release on appropriate conditions.

### 3.    The Bombardier N357TC

The government also points to Mr. Goettsche's Bombardier Inc. Model CL-600-2B16

aircraft, serial number 5410, U.S. registration number N357TC ("Bombardier N357TC") as

evidence that he is a flight risk.  Mr. Goettsche does not have access to the plane and it is up for

sale, rendering it irrelevant.  During the pendency of the sale, he can take a variety of steps to

ensure that neither he nor anyone else he knows has access to the aircraft.[4]  For example, he can

store the plane at a secure hanger at the Rocky Mountain Metro Airport, and the passcode to

enter the secured hanger will be known only to Signature staff and any individuals approved by

Pretrial Services to facilitate the sale of the Bombardier N357TC.  Mr. Goettsche will also

consent to any additional conditions imposed by Court order to remove the plane from his

control and prevent any use.

Moreover, it is relevant to note that the ownership of the plane is not a result of the

defendant affirmatively seeking to own an airplane.  Rather, the plane belonged to one of Mr.

Goettsche's business partners and was offered to Mr. Goettsche in the settlement of a business

---

[4] Because there is a $2.8 million note on the plane, it is anticipated that most of the proceeds from the sale
will go toward satisfying the note.

dispute.  As part of the resolution, Mr. Goettsche purchased his former partner's interest in a company and received the Bombardier N357TC aircraft as part of the transaction.

The government's motion asserts the ownership of two private planes by an unnamed, indicted codefendant located outside the U.S. as supporting Mr. Goettsche's detention.  Ex. A at 8-9, 25.  But the government does not explain how this alleged fact about someone else poses a realistic risk of flight as to this defendant, let alone an incurable one.  Nor does the government cite to any legal precedent for the notion that a Court should consider the ownership of an aircraft located outside the U.S, by a foreign person, in support of a request for detention of a non-owner inside the U.S.

### 4.    Mr. Goettsche's Assets

The government further argues that Mr. Goettsche is a flight risk based on broad and vague allegations about access to money.  For example, although the government has seized $9.7 million from Mr. Goettsche, it conclusorily asserts that he is nevertheless a flight risk because he has access to substantial "untraced" assets and that they are "overwhelming."  *See, e.g.*, Ex. A at 17-18 ("His access to wealth from anywhere in the world is so overwhelming there is no combination of conditions that would make fleeing the country anything more than a minor inconvenience."), 25 ("He has access to and has distributed hundreds of millions of dollars himself; however, law enforcement has not been able to trace, locate, and seize much of this lost investor money.").  Putting aside for the moment how the government knows so much about what it has not been able to "trace" or "locate," the government has painted a far different picture of what its own evidence shows regarding assets and loss in this case.  While it repeatedly calls this case a $722 million fraud (insinuating that money is floating around the world), the government ignores completely in the indictment and in its detention application the evidence establishing that BitClub Network received mining rewards of over 88,904 Bitcoin and 508,695

15

Ethereum during the last few years, and that the only way to do so is to purchase and operate massive amounts of computing power. *See* Section I.B. below.

However, assuming for arguments sake that Mr. Goettsche has access to enough wealth to live outside the U.S., it is not dispositive under the law. Courts have regularly released even foreign citizens on bond notwithstanding their vast international assets and financial resources. *See, e.g.*, *Hansen*, 108 F. App'x 331; *Griffith*, No. 1:20-CR-15; *Webb*, No. 15-CR-252; *Bodmer*, 2004 WL 169790; *Benhamou*, No. 17-CR-779. Speculation that such assets the government cannot identify are "overwhelming" does not support the motion for detention. *See, e.g., United States v. Harry*, No. 19-CR-246, Dkt. No. 85 at 6 ("While the Government has repeatedly suggested that Defendant may have access to significant funds in offshore accounts or elsewhere, that appears to be mere speculation); *Bodmer*, 2004 WL 169790 at *3 (rejecting the government's argument that the defendant likely had "vast financial resources in undisclosed offshore accounts" as speculation).

Nor is there anything inherently suspect about holding or transferring digital currency assets internationally. In fact, Bitcoin and Ethereum transactions are much more transparent than bank transfers in the traditional financial system because they are always available to the public and traceable in real time on the internet. And the Court can prohibit digital currency transactions over a certain amount without prior approval as a condition of release to cure any perceived risk. *See United States v. Sharma, et al.*, No. 1:18-CR-340, Dkt No. 5 (S.D.N.Y. April 25, 2018, July 31, 2018) (releasing defendant charged with conspiracy to commit securities fraud and wire fraud in connection with a digital currency-related scheme on a substantial bond, home detention with monitoring (later removed in favor or a curfew), and limitations on accessing digital currency).

The government also points to a "cold storage" (i.e., offline) wallet they found in Mr. Goettsche's home as purported evidence that he may have access to substantial funds. Ex. A at 18-19. That funds passed at some point in time through an offline wallet, which is commonplace, says nothing at all about how those funds were used, much less that Mr. Goettsche would use them to flee. Indeed, it appears that the government, not Mr. Goettsche, now controls that wallet and several other wallets it obtained as a result of a search warrant. Moreover, there is nothing illicit or even suspicious about using offline wallets. Major exchanges describe offline wallets as a best practice – and the only way – to avoid hackers and other security threats that routinely compromise digital currency businesses and exchanges.[5]

Finally, the government points to Mr. Goettsche's ownership of foreign real estate as evidence of risk of flight. *See* Ex. A at 22-23. Mr. Goettsche invested in houses in Belize and Costa Rica, and a timeshare in St. Kitts in order to derive rental income. These houses are actively rented out to third parties through a management company. St. Kitts, Costa Rica, and Belize all have extradition treaties with the U.S. *See* 18 U.S.C. § 3181, Extradition Treaty, U.S.-St. Kitts & Nevis, Sept. 18, 1996, TIAS 12805, Extradition Treaty, U.S.-Costa Rica, Dec. 4, 1982, TIAS, Extradition Treaty, U.S.-Belize, Mar. 30, 2000, TIAS 13089. Moreover, Mr. Goettsche's passport has already been seized, and his family has agreed to surrender their passports to Pretrial Services as a condition of bail if so ordered by the Court. The government therefore cannot meet its burden of showing risk of flight through the existence of these international rental properties.

---

[5] For example, the security pages of the two largest digital currency exchanges in the U.S., Coinbase and Gemini, describe how offline cold storage is essential: "98% of customer funds are stored offline… Offline storage provides an important security measure against theft or loss," https://www.coinbase.com/security, "The majority of assets are held in our offline, air-gapped Cold Storage system. Only a small portion is held in our online Hot Wallet," https://gemini.com/security.

Ultimately, the government's argument about assets boils down to a contention that Mr. Goettsche has access to too much wealth to release on bail. If that were the case, the wealthy would never be entitled to bond pending trial. Regardless of a defendant's wealth, the sole question under the Bail Reform Act is whether there are release conditions that will "reasonably" assure the defendant's appearance. Indeed, Judge Rakoff granted bail to Marc Dreier—who was accused of running a $400 million Ponzi scheme and who Judge Rakoff called a "master of deceit and doyen of dishonesty"—on conditions of home confinement and private security that the defendant would pay for himself. *See United States v. Dreier,* 596 F. Supp. 2d 831, 833 (S.D.N.Y. 2009) (finding defendant had significant motive to flee and access to wealth, "[b]ut the bail package that Dreier himself proposes goes far to minimize this risk"). Even Bernie Madoff, who was accused of stealing the life savings of untold numbers of victims in a $50+ *billion* Ponzi scheme and faced life in prison, received bail. *See United States v. Madoff*, No. 1:09-CR-213, Dkt No. 22 (SDNY January 16, 2009) (released on a $10 million personal recognizance bond, surrender of his passport, home detention and monitoring by a private security firm, and the surrender of valuable personal property).

The facts before this Court and prior precedent show that there are conditions of release that will reasonably assure Mr. Goettsche's appearance and that substantial wealth, wherever located and in whatever form, is not a basis to find that a defendant presents an immitigable risk of flight.

### B.     The Nature and Circumstances of the Offense Do Not Warrant Pretrial Detention.

 Bitcoin "mining" is the verification of all bitcoin transactions that happen across the bitcoin network. Mining plays an essential role in maintaining the bitcoin blockchain, which is an online public ledger showing every single bitcoin transaction that has ever taken place. Vast networks of specialized computers (mining equipment) compete to verify bitcoin transactions on

the blockchain and confirm that the sender actually has the funds to contribute to the transaction. To incentivize this resource-intensive service, the bitcoin blockchain automatically rewards the first computer to verify new sets of transactions with newly minted bitcoin.  Successfully mining one group of transactions, or one block, faces odds of one in trillions.  For this reason, successful mining operations require supercomputers that are able to solve astonishingly complex math problems in a very short amount of time and to make many attempts at it in that time.  A "mining pool" is the collection of many computers connected together to use their collective power to receive the reward.

BitClub Network created multiple data centers that housed huge networks of computers that made up its mining pool.  Because of its size, it was able to aggregate enough computer power to mine Bitcoin and Ethereum successfully on a very large scale.  BitClub network purchased mining equipment, paid the huge amount of electricity necessary to utilize all those computers, and hired personnel to support the company's operations.  Customers received a portion of the mining rewards mined by BitClub Network.

While the government alleges that that mining was "faked," it is aware that publicly available evidence shows that BitClub Network mined substantial, independently verifiable amounts of digital currency and purchased mining equipment in order to do so.  To date, BitClub Network was rewarded with over 88,904 Bitcoin and 508,695 Ethereum.[6]  The sheer quantity of these mining rewards – which exceed the full amount of the alleged fraud – necessarily means that BitClub Network had to invest in a huge amount of computer power and electricity.

---

[6]  Visiting etherscan.io and inputting BitClub Network's ETH wallet address (0xF3b9D2c81f2b24b0fa0ACaAa865b7D9CED5FC2fb) shows that 442,287.38 ETH blocks and 66,408.13 ETH uncles were mined.  This is publicly-available information.

Without explaining its calculations, the government claims that "[t]he Fraud Co-Conspirators, through BCN, obtained at least $722 million from investors."  *See* Dkt. No. 9 (Indictment) at 5; *see also* Ex. A at 9 ("As set forth in the New Jersey Indictment, the scheme amassed at least $722 million in bitcoin from investors.").  Even if that number accurately represents how much money customers gave to BitClub Network, that fact in a vacuum is not relevant for purposes of assessing whether defendant is a risk of flight.  As a matter of fairness, it must be presented next to the equally important fact that BitClub Network received substantial digital currency mining awards of over 88,904 Bitcoin and 508,695 Ethereum.

## II.    Proposed Bail Package

Not only do the above facts show that Mr. Goettsche does not present a serious flight risk but, even if he did, the law requires his release so long as there are conditions that will reasonably assure his appearance.  18 U.S.C. § 3142(e); *see also United States v. Berrios-Berrios*, 791 F.2d 246, 251 (2d Cir. 1986) ("[M]any courts have set bail for defendants despite their propensity to flee.").  Release conditions need only provide "reasonable assurance" of a defendant's appearance at future proceedings.  They need not "guarantee" his or her appearance.

Mr. Goettsche submits the following conditions of release do in fact reasonably assure his appearance at trial, if he is deemed a serious risk of flight:

1.  A $5 million personal recognizance bond partially secured by equity from the following properties:

    a.  80 Rivera Court, Erie CO 80516 (owned by Mr. Goettsche and his wife, with an estimated value of $587,386.00);

    b.  2990 Pennsylvania Avenue, Boulder, CO 80301 (owned by Mr. Goettsche, with an estimated value of $659,820.00);

c.  2855 Blue Sky Circle, Unit 3-103, Erie CO 80516 (owned by Mr. Goettsche through an entity, with an estimated value of $286,000);

d.  4734 Essex Court, Boulder CO 80301 (owned by a relative, with an estimated value of $275,600 );

e.  2650 Lawrence Court, Lafayette, CO 80026 (owned by Mr. Goettsche through an entity, with an estimated value of $1,490,288.00).

2.  The aforementioned $5 million bond to be co-signed by his mother, stepfather and a friend whose names have been provided to Pretrial Services;

3.  Travel restricted to the District of Colorado, the Southern District of New York for the purposes of visiting attorneys only and the District of New Jersey, with all travel to be preapproved by Pretrial Services;

4.  Surrender of all travel documents and those of Danielle Goettsche and their three children.

5.  The sale of the Bombardier Inc. Model CL-600-2B16 aircraft, serial number 5410, U.S. registration number N357TC ("Bombardier N357TC").  During the pendency of the sale, the Bombardier N357TC will be stored at a secure hanger at the Rocky Mountain Metro Airport, and the passcode to enter the secured hanger will be made known only to Signature staff and any individuals approved by Pretrial Services to facilitate the sale of the Bombardier N357TC; and

6.  Home detention with GPS monitoring at 2650 Lawrence Court, Lafayette, Colorado, except for pre-approved meetings with attorneys, medical visits or religious services.

These conditions put Mr. Goettsche's own money and property, and that of his family, at stake; they ensure that his whereabouts will be known at all times; and they further ensure that he will not have any access whatsoever to international travel.  Most importantly, his release on

these conditions will allow him to have a full and fair opportunity to defend himself at trial and to assist his attorneys in preparing to do so, all without being 2,000 miles away from his wife and three young children.

Respectfully submitted,

*/s/ Andrew C. Lourie*

Andrew C. Lourie
Benjamin J.A. Sauter
Hartley M. K. West
KOBRE & KIM LLP
(212) 488-1288
Benjamin.sauter@kobrekim.com
Andrew.lourie@kobrekim.com
Hartley.west@kobrekim.com

Rodney Villazor
SMITH VILLAZOR LLP
250 W 55th Street, 30th Floor
New York, New York 10019
(212) 377-0852
Rodney.villazor@smithvillazor.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 31, 2020, I filed the foregoing with the Clerk of Court using the Court's CM/ECF system, which will serve an electronic copy to all counsel of record.

/s/ Andrew C. Lourie

Andrew C. Lourie