# EXHIBIT E

Case 2:19-cr-00877-CCC-1 Document 36-6 Filed 01/31/20 Page 2 of 56 PageID: 498
Case 1:20-cr-00015-PKC Document 12 Filed 02/08/20 Page 2 of 56

1

Jcudgrih

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,              New York, N.Y.

4           v.                             19-MAG-10987

5    VIRGIL GRIFFITH,

6                 Defendant.

7    ------------------------------x

8
                                           December 30, 2019
9                                          11:16 a.m.

10
     Before:
11
                        HON. VERNON S. BRODERICK,
12
                                           District Judge
13

14                           APPEARANCES

15   GEOFFREY S. BERMAN
          United States Attorney for the
16        Southern District of New York
     BY:  MICHAEL KROUSE
17        Assistant United States Attorney

18   BAKER MARQUART, LLP
          Attorneys for Defendant
19   BY:  BRIAN E. KLEIN
               – and –
20   KOBRE & KIM LLP
     BY:  SEAN BUCKLEY
21
               – also present –
22
     MOHAMMED AHMED, U.S. Pretrial Services
23
     S.A. Brandon Cavanaugh, Federal Bureau of Investigation.
24

25

```
 1              THE CLERK:  United States v. Virgil Griffith.

 2              Counsel, please state your appearances for the record.

 3              MR. KROUSE:  Good morning, your Honor.  Michael Krouse

 4    for the United States.  With me at counsel table is Special

 5    Agent Brandon Cavanaugh from the FBI.

 6              THE COURT:  OK.  Good morning.

 7              MR. KLEIN:  Good morning, your Honor.  Brian Klein

 8    from Baker Marquart.  With us is Virgil Griffith, who is in

 9    custody.

10              MR. BUCKLEY:  And sean Buckley, from Kobre & Kim, on

11    behalf of Mr. Griffith as well.

12              THE COURT:  Good morning.  You may be seated.

13              MR. BUCKLEY:  Good morning, your Honor.

14              THE COURT:  So we are here today for a bail appeal

15    relating to an order that Mr. Griffith be detained by

16    Magistrate Judge Moses.

17              I thank counsel for your timely and quick response to

18    my order of last night.  I will take care of unsealing this

19    matter.  As I understand it, it should have been -- there may

20    have been some administrative issue.  That is the reason why it

21    hadn't been unsealed already.  So, we'll do that so eventually

22    my order and as well as the other materials will be available

23    on the court's docket.

24              So I have reviewed -- I can't say I have read cover to

25    cover everything that has been provided to me, but let me --
```

1   and I think the government has provided answers to each of the

2   questions.  And what I would say in connection with -- let me

3   just -- I apologize.  Let me just review everything that I

4   actually have.

5          I have the government's letter of December 30th, with

6   attachments.  I have the defense letter of December 29th.  I

7   have the statements of Mr. Griffith from the -- excuse me, the

8   reports, the FBI 302s of Mr. Griffith's statement to

9   authorities in May 2019 and November of 2019.  I have the

10  complaint; the two transcripts, one from the Northern District

11  of California, one from here.  I have the Pretrial Services'

12  reports from both the Northern District of California and here,

13  and then I have a copy of my order.

14         Are there any other documents I should have in

15  connection with today's argument?

16         MR. KROUSE:  No, your Honor.

17         MR. KLEIN:  Not from the defense, your Honor.

18         THE COURT:  OK.  Fantastic.

19         So in connection with the defense's -- and let me ask,

20  has -- although I know I received the 302s, I take it the

21  defense counsel has not received them?

22         MR. KLEIN:  No, your Honor.  We repeatedly requested

23  them and have not been provided with them.

24         THE COURT:  OK.

25         MR. KROUSE:  That is correct, your Honor.

Case 2:19-cr-00877-CCC Document 36-6 Filed 01/31/20 Page 5 of 56 PageID: 501
Case 1:20-cr-00015-PKC Document 12 Filed 02/08/20 Page 5 of 56

4

Jcudgrih

1          THE COURT:  All right.  So in connection with that, I

2     mean, I would say the following.  I imagine that in due course

3     the government will make discovery available.  In making

4     whatever ruling I make, I'm not going to rely on anything in

5     the report that is not contained in the complaint.  And to the

6     extent that I find that there is something that is in

7     Mr. Griffith's favor, Dr. Griffith's favor, in connection with

8     the report, I'll consider that, since it is something that was

9     in the government's knowledge at the time of the arrest and the

10    various arguments that have been made.

11         So I don't know -- or obviously it is the government's

12    burden to show.  There is already an order in place in

13    connection that the defendant be detained.  So I guess I will

14    hear from the defense first and then I will hear from the

15    government.

16         MR. KLEIN:  Sure, your Honor.

17         Your Honor, we believe Mr. Griffith should be released

18    promptly.  We believe there are reasonable conditions that can

19    be imposed, that he will make all his appearances in court.  He

20    plans to fight this case.  We want to be able to work with him,

21    work through the discovery, prepare his defenses.  And I want

22    to -- we submitted a letter that goes into great detail.  I

23    wanted to look at some of your questions, your Honor, if you

24    don't mind.

25         THE COURT:  Sure.

Case 2:19-cr-00877-CCC Document 36-6 Filed 01/31/20 Page 6 of 56 PageID: 502   5
Case 1:20-cr-00015-PKC Document 112 Filed 04/08/20 Page 58 of 58

Jcudgrih

1          MR. KLEIN:  Because I think they speak to things that

2   help elucidate why Mr. Griffith should be released.

3          So, number two is, "If granted bail, will Defendant

4   Griffith be able to live in the Southern District of New York?"

5   Your Honor, in our submission last night, we noted in a

6   footnote that he could live here.  There is a friend who would

7   let him live in his house.  We have confirmed that.  So he

8   could reside here.

9          We don't think that is necessary.  Both pretrial

10  reports recommend that he live with his parents.  His father is

11  here today, your Honor.  His mother had to return to

12  Tuscaloosa.

13         Just so you know a little bit more about his parents,

14  both his parents are doctors.  They are law-abiding citizens.

15  His mom is a retired radiologist.  His dad is a dermatologist

16  who has the second largest dermatology association in north

17  Alabama.  These are well-respected, well-rounded members of the

18  community.  They are willing to put their son in their house.

19  So I think he should reside in Tuscaloosa with his family and

20  that would be appropriate.

21         Going to your --

22         THE COURT:  Mr. Klein, let me ask you this.

23  Regardless of whether he is here in the Southern District or in

24  Alabama, do you know whether or not he would either

25  logistically continue to be able to work or whether -- well,

1   why don't we start with logistically whether he would be able

2   to continue to work?

3           MR. KLEIN:  His job at the Ethereum Foundation, your

4   Honor, he has been suspended.  He is not working there now

5   while he is dealing with this matter.  He is not working there.

6           THE COURT:  All right.

7           MR. KLEIN:  So, you know, if he is released, we could

8   go back to his employer and see if they would let him work

9   remotely from Alabama, but at present he was detained, he was

10  arrested, but we are willing to do that.  They have been very I

11  would say supportive of him throughout this, although the

12  issues here are totally unrelated to his work there.  I want to

13  make that very clear.

14          So going to the other point about question three,

15  about him being in Alabama, your Honor, I represent a lot of

16  people around the country.  I represent people in this district

17  who have to travel.  I actually have a case in the Southern

18  District right now involving cryptocurrency.  It is U.S. v.

19  Sharma, et al., 18-340.  It's in front of Judge Schofield.  My

20  client in that case, Robert Farkas, is accused of -- I would

21  say potentially faces much more prison time than here.  He is

22  in the Southern District of Florida, in Miami.  He wears an

23  electronic monitoring bracelet.  He flies up here.  He has made

24  all of his appearances and has been in good compliance.

25          There is nothing unusual about a defendant being in a

Case 2:19-cr-00877-CCC Document 36-6 Filed 01/31/20 Page 8 of 56 PageID: 504
Case 1:19-cr-00015-PKC Document 112 Filed 02/08/2019 Page 10 of 56

Jcudgrih

1      different district.

2                  THE COURT:  I think the government -- I think, and let

3      me confirm this -- I think the government concedes that they

4      are unaware of any sort of differences.  I think their point

5      was he couldn't be monitored in this district if he's somewhere

6      else.  But let me just -- Mr. Krouse, is that accurate?

7                  MR. KROUSE:  Yes, your Honor, that is accurate.  We're

8      not aware of any impediment for having Mr. Griffith supervised

9      in Alabama.

10                 THE COURT:  Yes.

11                 MR. KROUSE:  We do note in our letter that that does

12     increase the possible risk of flight, namely, his need to

13     travel here for court appearances by presumably flying and

14     possibly at that point using that opportunity to fly elsewhere.

15                 THE COURT:  OK.

16                 MR. KLEIN:  Your Honor.

17                 THE COURT:  Yes.

18                 MR. KLEIN:  I had a client similarly situated who was

19     in LA and it was out of the Eastern District of Wisconsin, and

20     my understanding is the electronic monitoring equipment in most

21     parts of the country you can actually fly with.  So you

22     actually fly with your ankle bracelet on you.  So, he could be

23     monitored.  And I am aware that in other cases I have had

24     Pretrial will escort the person to the airport and make sure

25     they get on the flight.  They bring actually a copy of their

Case 2:19-cr-00877-CCC Document 36-6 Filed 01/31/20 Page 9 of 56 PageID: 505
Case 1:20-cr-00015-PKC Document 112 Filed 02/08/20 Page 11 of 56          8

Jcudgrih

1   itinerary often with them as well as the docket, because, of

2   course, when you go through security, if you are wearing an

3   ankle bracelet, it is metal and they are going to stop you.

4           He would not have his passport, your Honor, to be very

5   clear.  Pretrial has his passport.  We thought it would be

6   transported here by now.  We were provided his passport card,

7   which is different.  It is his only form of ID.  Mr. Buckley

8   has it with him.  He would need ID to travel.  But, you know, I

9   don't think there is any significant greater risk of flight

10  from Alabama coming here, which -- and it does happen, your

11  Honor, so --

12          THE COURT:  What is the closest -- and maybe

13  Dr. Griffith -- the other Dr. Griffith might be able to

14  elucidate, what is the closest international airport?  Does

15  Tuscaloosa have an international airport, Doctor?

16          DR. GRIFFITH:  Tuscaloosa does not have an

17  international airport.  Perhaps Birmingham or possibly Atlanta.

18          THE COURT:  OK.  How far away is Birmingham and/or

19  Atlanta from where you live?

20          DR. GRIFFITH:  Birmingham is roughly 60 miles, and

21  Atlanta is roughly 150 to 180.

22          THE COURT:  OK.  Thank you.

23          I'm sorry, Mr. Klein.  Go ahead.

24          MR. KLEIN:  No.  I didn't know the geography of

25  Alabama either, so that was helpful to me, too.

Case 2:19-cr-00877-CCC Document 36-6 Filed 01/31/20 Page 10 of 56 PageID: 5069
Case 1:20-cr-00015-PKC Document 12 Filed 02/08/20 Page 22 of 52
Jcudgrih

1          So, I think Pretrial, who also, I would just note, has

2     recommended these release conditions.  So they are the ones who

3     are saying release him, and obviously they feel capable of

4     monitoring him.  They don't think he is a flight risk if he is

5     in Tuscaloosa, and we would agree with Pretrial on that point.

6          THE COURT:  There are several points, actually, that I

7     want to make, and some of it relates -- well, some of it

8     relates to the government's case, some of it relates to some of

9     the alleged activities of Mr. Griffith.  Something I want to

10    emphasize regardless of where I come out, and, Mr. Griffith,

11    I'm speaking directly to you:

12         Laws in this country are not suggestions.  I

13    understand from what I've read that you may have thought that

14    it -- well, you didn't think you would end up here, and you may

15    have thought that, at most, your passport would be revoked.

16    And the government has at its disposal a wide range of things

17    they could have done, including where we are today.  And one of

18    the problems, quite frankly -- and, look, I don't know, you

19    know, from some of the comments that were made, the underlying

20    conduct, money laundering, is illegal.  Assisting foreign

21    governments -- and, again, I'm just saying from what has been

22    alleged.  Assisting foreign governments to conduct that money

23    laundering is illegal.  In particular, it is something that

24    I'll point out.

25         And I am not saying -- and there is no information

Case 2:19-cr-00877-CCC Document 36-6 Filed 01/31/20 Page 11 of 56 PageID: 507
Case 1:20-cr-00015-PKC Document 32 Filed 02/08/20 Page 11 of 56      10
Jcudgrih

1    that you were in fact doing this.  But it was suggested, one of

2    the things, that you could assist with money laundering

3    relating to, let's say, narcotics.  And I'm not saying it would

4    be -- you would provide the necessarily the means, in other

5    words the blockchain, or whatever it may be, the technology for

6    folks to utilize Bitcoin in order to carry that out, but that

7    is illegal, and, as you know, there have been other defendants

8    who have run afoul of things like that.  And I am not saying

9    you would do that.

10           But I want to emphasize that the laws aren't

11   suggestions.

12           And one other thing.  I've never been in North Korea,

13   but what I know about North Korea is one thing I know, that you

14   wouldn't be having a bond hearing.  All right?  That wouldn't

15   happen.  What I also know is that I know, from some of your

16   statements, that you may have felt that because of your

17   knowledge and because of the desire of others to perhaps get

18   information, that it would be OK.  I think that that is

19   somewhat naive, you know, because there are things that happen

20   in that country, and I think the media has reported on some, to

21   United States citizens that have no -- it is not necessarily

22   logical.  Let me just -- I'll stop there.

23           But I wanted to make those points because I can't

24   emphasize enough that, you know, that part of the concern I

25   have is just that, some of the things that are more on the

Case 2:19-cr-00877-CCC Document 36-6 Filed 01/31/20 Page 12 of 56 PageID: 508
Case 1:20-cr-00015-PKC Document 32 Filed 02/08/20 Page 34 of 52

Jcudgrih

1    periphery than necessarily specifically in the charges.

2            Go ahead, Mr. Klein.

3            MR. KLEIN:  Yes, your Honor.  Just so it's totally

4    clear, he is not accused of money laundering and sanctions

5    violation.

6            THE COURT:  Yes.

7            MR. KLEIN:  But I would add to that, your Honor, and

8    just as a point, you know, we don't dispute that he went to

9    North Korea, just to be very clear.  Neither does Mr. Griffith.

10           THE COURT:  Yes.

11           MR. KLEIN:  But I think what the point is we emphasize

12   in our letter is that when he knew he was under investigation,

13   he stayed here at the request of the FBI, and that I think

14   really demonstrates his ability to respect law enforcement and

15   to be respectful of your Honor's orders if you release him, and

16   I think that is one of the most compelling facts here.

17           He could have gone home and worked.  He had a

18   legitimate reason to go back to Singapore, which has an

19   extradition treaty, even, but he stayed here.  He listened to

20   the FBI.  He was compliant.  His attorney was engaged with the

21   government, provided his itinerary.  So I think those are all

22   very -- and he authorized his attorney to do that.  So I think

23   these are all very compelling facts.

24           But turning to the point, your Honor, going back to

25   your questions, question number four I believe I answered when

Case 2:19-cr-00877-CCC Document 36-6 Filed 01/31/20 Page 13 of 56 PageID: 509
Case 1:20-cr-00015-PKC Document 12 Filed 02/08/20 Page 13 of 56

12
Jcudgrih

 1   I answered question number three.  A bunch of the other

 2   questions, your Honor, are really directed to the government,

 3   and they answered them in their letter.

 4              THE COURT:  Yes.

 5              MR. KLEIN:  So I would note a couple of things, your

 6   Honor.  You know, my client can be verbose and can say things

 7   that are provocative.  It doesn't mean that they are

 8   necessarily meant to be taken seriously, and I think your Honor

 9   zeroed in on that a little bit with your questioning and asking

10   the government to respond and provide information about

11   statements that were made.  And if we just talk about -- I

12   don't know if you want to talk about those statements now, if

13   they were of particular concern to you, but I do think that

14   they were not -- particularly the ones with his parents were

15   not taken seriously.  What I would like to do, though, is

16   address a few of the points they raise in their letter, the

17   government's letter from last night.

18              THE COURT:  OK.

19              MR. KLEIN:  So I think I would like to start off by

20   talking about a few of the things they talk about, this other

21   cryptocurrency, SpankChain, which has an unusual name -- I

22   never thought I would say that in court -- and the Dark Web

23   parts.  I don't know if that concerns your Honor.  I can

24   explain those things.  I am happy to explain those to your

25   Honor.

1      THE COURT:  I would like to hear about that because it

2  is something obviously that I don't think was before -- I mean,

3  there may have been some reference to it before Judge Moses but

4  I don't think there was that level of specificity.

5      MR. KLEIN:  Yes, your Honor.

6      So my client helped develop what is essentially a

7  Google for the Dark Web, and so that's a portion of the

8  Internet that's sort of disconnected from the rest of the

9  Internet.  I don't know how familiar you are with the Dark Web,

10  and I am not a technical expert so I don't really want to be

11  the one to explain it to you.  But I will say it is essential

12  like Google.  He developed it with an individual named Aaron

13  Schwartz, who actually unfortunately committed suicide during a

14  prosecution unrelated to anything about this, a few years ago

15  and was a close friend of our client's.  My client is a serious

16  Ph.D. and serious researcher.  He actually had written a paper

17  about the Dark Web, and I wanted to offer it up just so you

18  could understand there is actually strong academic interest in

19  this.

20      Would you mind if I approach, your Honor?

21      THE COURT:  No.  Please, go ahead.

22      Do you have a copy for the government?

23      MR. KLEIN:  I do have a copy for the government, your

24  Honor.

25      (Handing)

Case 2:19-cr-00877-CCC Document 36-6 Filed 01/31/20 Page 15 of 56 PageID: 511
Case 1:20-cr-00015-PKC Document 12 Filed 02/08/20 Page 15 of 56
14
Jcudgrih

1          THE COURT:  Thanks.

2          MR. KLEIN:  So I'll give your Honor a moment just to

3    look at the cover.

4          (Pause)

5          He wrote that while he was at MIT at an outpost in

6    Singapore, your Honor, just so you know, and he moved to

7    Singapore for professional reasons.

8          So, he obviously is a very serious academic, very

9    credentialed, incredibly smart, Ph.D. from Caltech.  It is the

10   number one university in the world on some lists.

11         So going to this browser for the Dark Web, your Honor,

12   he actually doesn't control it anymore, and he was kicked out

13   of the Tor project because he actually helped educate law

14   enforcement about it and he was telling them how they could use

15   it.  He went and spoke with Interpol about this until he was

16   ultimately kicked out of the Tor project for that.

17         So even there, your Honor, there is a strong academic

18   interest, plus he's no longer involved essentially because he

19   was educating law enforcement.  He doesn't operate it anymore.

20   I believe the Hermes Center for Transparency and Digital Human

21   Rights operates it.

22         Just so you know a little bit more about the Dark Web,

23   your Honor, the Dark Web, like VPNs -- I don't know if your

24   Honor knows what a VPN is.

25         THE COURT:  I think that is the way I access when I am

Case 2:19-cr-00877-CCC Document 36-6 Filed 01/31/20 Page 16 of 56 PageID: 5121
Case 1:20-cr-00015-PKC Document 12 Filed 02/08/20 Page 16 of 56

15
Jcudgrih

1    at home my --

2           MR. KLEIN:  Yes.  A lot of times the government puts

3    it in an indictment with people accused of hacking crimes, too,

4    your Honor.  They put it in as something nefarious, but

5    businesses use VPNs, law enforcement uses them.  The Dark Web

6    often is used for similar purposes.

7           THE COURT:  Well --

8           MR. KLEIN:  So there are --

9           THE COURT:  But wait.  When you are saying that there

10   are legitimate businesses that use the Dark Web --

11          MR. KLEIN:  There are legitimate reasons to use the

12   Dark Web, absolutely, your Honor.  There are dissident groups

13   that use the Dark Web.  I pulled an article last night talking

14   about this, or the other day.  Facebook has over 1 million

15   people who access it through the Dark Web because they can't

16   access Facebook from their country.  So there are very

17   legitimate uses.  Now, are they all legitimate on the Dark Web?

18   We are not going to say that.

19          THE COURT:  I hazard a guess -- because I just read

20   the first, the abstract of Mr. Griffith's paper from MIT.

21          MR. KLEIN:  Yep.

22          THE COURT:  And the idea that it was a misnomer that

23   it is the Web because basically people focus in one particular

24   area, and some of that I think has to do with whatever interest

25   or whatever dealings the people are doing, some of which are --

1    and, again, I'm not saying all but some of which are nefarious.

2    So I understand what you are saying, that there are reasons to

3    utilize it, and I'm not saying that -- in fact, as far as I

4    know, there was nothing illegal about what Mr. Griffith did in

5    connection with it.

6         MR. KLEIN:  There isn't, your Honor.  And just to be

7    clear, the takeaway that I wanted your Honor to have were he

8    had an academic interest.  He educated law enforcement about

9    it.  He no longer controls that.  And so I don't think it is

10   really an issue here, and I don't think it has any indication

11   that he is a risk of flight because of it.

12        Turning to SpankChain, your Honor.  That is a

13   blockchain/cryptocurrency that was developed for people who

14   want to purchase porn.  Like Canada's porn, often people don't

15   want to use their credit card or their bank account.  It is a

16   U.S.-based company.  So this is not foreign unknown entity; it

17   is U.S.-based.  It is based in California.  They have been

18   trying to develop a cryptocurrency for porn purchases, which is

19   also illegal -- which is also legal.

20        So I think, again, that does not indicate anything

21   other than he is involved in various activities.  Do his

22   interests lean towards the direction of cryptocurrency and the

23   Web?  Yes, that's his interest.  That's his longtime interest.

24   But none of that is illegal, and none of the enterprises that

25   he is involved in that they reference are illegal.

Case 2:19-cr-00877-CCC Document 36-6 Filed 01/31/20 Page 18 of 56 PageID: 514
Case 1:20-cr-00015-PKC Document 12 Filed 02/08/20 Page 20 of 58

17
Jcudgrih

1    So I would like to turn to page 6 of the government's

2    letter.  One of the questions for the defense, your Honor, was

3    about Mr. Griffith's sources of funds.  On that page there is

4    an extract -- alleged extract from I believe Mr. Griffith's

5    phone that the government inserted.

6    Now, I would focus your attention on the date and time

7    of that.  That was March 2018.  Mr. Griffith has possessed

8    ether.  We don't dispute that.  He disclosed it to Pretrial.

9    He accurately made a disclosure to Pretrial.  The context that

10   I would add to this, your Honor, which I think is very

11   important, is that in talking about the amount of money he had

12   in ether at the time, in March 2018 the price of ether was

13   approximately $850.  Today it is approximately $130.  So it's

14   dropped dramatically.  At the time, his ether was worth

15   approximately a million dollars.  We don't dispute that.  But

16   today it's not worth that amount.  It's worth the amounts that

17   have been disclosed to Pretrial.

18   He did make an investment in a crypto hedge fund at

19   that time.  It wasn't -- it does not mean exactly $200,000.  It

20   was less.  He sold it.  He declared it on his taxes.  And he

21   moved the remainder of the funds to his coin-based account,

22   which was disclosed to Pretrial.

23   So just to track that, your Honor, at one point he had

24   a lot of money in ether.  He did put some in this crypto hedge

25   fund.  He sold that.  He moved those funds to his coin-based

1    account, which has been disclosed to Pretrial and is accounted

2    for both in the government's letter and in the Pretrial report.

3    So I just wanted -- and it was declared on his taxes.

4           I don't know if you have any further questions about

5    that point, your Honor.

6           THE COURT:  I don't.

7           MR. KLEIN:  Moving on, your Honor, to page 7.  I

8    already discussed some of his blockchain activities.  There is

9    an outtake here is about him allegedly wanting to mediate

10   economic relations between North Korea and South Korea.  You

11   know, I don't think that has anything to indicate that he might

12   be a flight risk.  That goes to the charges we're facing and

13   the merits that we're obviously not addressing here today.  I

14   will say though that we do have defenses, your Honor.  We're

15   working actively on those.  And we dispute the government's

16   complaint and allegations.  And so I just want to make that

17   very clear.  And so they say they have a strong case; we think

18   we have a strong defense.  To the extent it might be relevant

19   to your Honor, we've prepared some things in camera to indicate

20   areas that we will raise as a defense, including we believe

21   evidence that directly undercuts their case.

22          But, again, I don't think this extract on page 7 that

23   they quote has anything to do with flight risk.  In fact, it

24   goes to peace.  I believe his talk in North Korea was entitled

25   Blockchain and Peace.  So to the extent, taking this as even

Jcudgrih

1    true, it seems likes he, whether we think it was a wise idea

2    here in this courtroom or anyone else does to try to mediate

3    some sort of peaceful understanding, I think that's context you

4    could put into this.

5        If you turn to -- on this page also the government

6    talks about, again, him being a flight risk.  We've noted he

7    doesn't have his passport.  He would agree to reasonable

8    conditions.

9        The last thing they talk about is him renouncing his

10   citizenship.  We address that in our letter, your Honor.  He

11   did not renounce it.  He took no affirmative steps to renounce

12   it.  He did think about it, your Honor, but he didn't do it.

13   He, again, no affirmative steps.  And the government even

14   notes, which I think is of note, there was discussion, they

15   claim, of him renouncing it to go to St. Kitts, but in a later

16   footnote they note that St. Kitts actually has an extradition

17   treaty.

18       THE COURT:  I looked that up.  In fact, I actually --

19   well, in full disclosure I guess is that I have a trip planned,

20   perhaps later at some point, to the sister island of Nevis, or

21   Nevis, however it is pronounced.  But in any event, I looked

22   that up because I felt that was odd.

23       But there may be a distinction between extradition for

24   someone who is -- well, I don't know.  In other words, in any

25   event --

1          MR. KLEIN:  He didn't do it.  In fact, what he did do

2     instead, your Honor, was set up a residence in Puerto Rico,

3     which is part of the United States.  It is a territory.  Right?

4     And he has a residence there.

5          So he didn't renounce.  He didn't take any steps.  He

6     didn't go to a lawyer.  he didn't file paperwork.  When he was

7     under investigation, he stayed here.  He does have a residence

8     in Puerto Rico.  We all know Puerto Rico, you know, there is a

9     U.S. Attorney's Office there.  That is the United States for

10    all intents and purposes, or is the United States.  So --

11         THE COURT:  Does he have other connections to Puerto

12    Rico?

13         MR. KLEIN:  No, your Honor.  He has a friend, I

14    believe, who lives there.

15         THE COURT:  Is there a girlfriend?

16         (Pause)

17         MR. KLEIN:  He has a friend who lives there, an

18    ex-girlfriend lived there, and he has other connections.  I

19    think he moved his business from Delaware to Puerto Rico, he

20    has an LLC, so he does have ties to Puerto Rico, and he rents

21    an apartment there.

22         Turning to page 9 of the government's submission from

23    last night -- and, actually, I think 9 and 10, pages 9 and 10

24    work together.  So I would direct your attention actually to

25    first the bottom of page 10.  This is an exchange with one of

1 his parents, an alleged exchange.  Again, we haven't received

2 discovery.  We don't have necessarily the full context.  We

3 haven't seen his statements.  But judging on what the

4 government submitted, you know, at the end he says, "I

5 regularly roll grenades into the room and someone needs to

6 really jump on it."

7    He is a provocator, your Honor.  He does say thing

8 that might be provocative and not meant to be taken seriously

9 but he just says things, you know, and I think that's what page

10 9 shows us.  You know, SpankChain isn't actually a

11 pornographer, it supplies a solution for paying for

12 pornography, but, you know, there he refers to himself as a

13 pornographer.  He is not going to become Larry Flint if he goes

14 to SpankChain.  He is going to help them build a cryptocurrency

15 or work with them.

16    So when he says the porn important stuff isn't

17 actually that bad, I just joined them as an advisor, you know,

18 he's dialing back his own sort of provocative statement to his

19 parents.  I think -- I have kids.  My kids say things to me to

20 get a rise out of me.  I don't know if your Honor has children,

21 but children often say things to their parents to get a rise or

22 a reaction.  Whether it is, you know -- maybe it had been

23 unfortunate this case, the subject matter and how he phrased

24 them, but it doesn't mean he is a flight risk, let alone a

25 serious one.

Jcudgrih

```
 1          THE COURT:  OK.  Let me ask, with regard to the two
 2   homes, the one in Alabama and the one in Maryland, do you have
 3   an understanding of what the equity is in those homes,
 4   approximately?
 5          MR. KLEIN:  Yes, your Honor.  Let me just get that
 6   real quick.
 7          (Pause)
 8          Your Honor, Alabama is about $835,000.
 9          THE COURT:  OK.
10          MR. KLEIN:  And his only sister's home in Maryland is
11   approximately $490,000.
12          THE COURT:  Is that the equity or the --
13          MR. KLEIN:  Actually, that says the value, your Honor.
14   Let me see if that's the equity.
15          THE COURT:  And for the Alabama home, is that the
16   value or the equity?
17          DR. GRIFFITH:  That's value.
18          THE COURT:  OK.
19          MR. KLEIN:  Sorry, your Honor.
20          DR. GRIFFITH:  There are no liens on the Alabama
21   property.
22          THE COURT:  OK.
23          MR. KLEIN:  I don't know if his sister owns her house
24   outright, I don't think she does, your Honor, so it probably is
25   less.
```

Case 2:19-cr-00877-CCC Document 36-6 Filed 01/31/20 Page 24 of 56 PageID: 52023
Case 1:20-cr-00015-PKC Document 12 Filed 03/08/20 Page 26 of 58

Jcudgrih

 1                THE COURT:  All right.  Thank you.

 2           Mr. Krouse.

 3           MR. KROUSE:  Thank you, your Honor.

 4           Your Honor, for the reasons stated in our letter of

 5  last night, we believe that Judge Moses' detention order should

 6  be affirmed, for various reasons.

 7           First, the defendant -- just at the highest level, the

 8  defendant is an extremely serious flight risk here.  The

 9  defense counsel has tried to minimize the conduct, but the

10  conduct here is extremely serious and the government's case

11  against the defendant is very strong.

12           With respect to the text messages alone -- and these

13  aren't the entire universe of text messages, these are just

14  select text messages -- it is quite apparent that the defendant

15  knew exactly what he was doing.  He knew the illegal nature of

16  the activities and he carried through with them anyway.

17           So there is a text message that the government

18  reproduces on page 2 where Mr. Griffith's mother asks him what

19  the North Koreans' interest is in cryptocurrency, and Griffith

20  replied, "Probably avoiding sanctions, who knows."  And that's

21  at the top of the government's submission on page 2.

22           In another conversation, Mr. Griffith is discussing

23  the conference with another person, and that person expresses

24  some concern for Mr. Griffith's safety.  And he responds,

25  "North Korea wouldn't want to scare away blockchain talent that

1    will let them get around sanctions."  And in response, the

2    individual says, "What if they're funding their drug trade and

3    nuclear program with crypto?"  And Griffith says, "Unlikely,

4    but they'd probably like to start doing such."

5          So it is not as though Mr. Griffith was some peace

6    ambassador for cryptocurrency and that was his only intent and

7    the only activities he was engaging in.  He was engaging in

8    these activities knowing with his eyes wide open that North

9    Korea was planning to use cryptocurrency and blockchain

10   technologies for extremely nefarious means.

11         THE COURT:  Let me ask you this, Mr. Krouse.  Do you

12   know, in terms of the attendees at the conference -- and,

13   obviously, to the extent you want to disclose it -- do you know

14   whether they were government actors at the conference?  In

15   other words, I know that there were other individuals that came

16   that were part of Mr. Griffith's group but the actual people

17   who were in the audience.

18         MR. KROUSE:  A couple of things on that, your Honor.

19   We do know that many of the attendees were government officials

20   from North Korea.  Also knowing how North Korea works, they

21   don't have a private economy.  They are a state-run

22   totalitarian nation.  Everyone -- an inference could be drawn

23   therefor that everyone from North Korea who was participating

24   in the conference and gaining the technical insights that

25   Mr. Griffith was providing worked in some way for the North

Case 2:19-cr-00877-CCC Document 36-6 Filed 01/31/20 Page 26 of 56 PageID: 522
Case 1:20-cr-00015-PKC Document 12 Filed 03/08/20 Page 26 of 56

25
Jcudgrih

 1    Korean government.  There aren't businesses in North Korea.

 2    Everything is run by the state.

 3         And the whole purpose of North Korea having

 4    conferences like this is to gain access to technologies that

 5    they wouldn't otherwise have access to to gain technical

 6    knowledge that they may not be able to get through other means

 7    and then to use those technologies to further their nation's

 8    goals, which include things like money laundering in order to

 9    gain access to hard currency, evade sanctions, include

10    investing in nuclear capabilities, cyber war capabilities.  The

11    reason why these sanctions are in place on North Korea is

12    exactly to prevent them from gaining access to those resources

13    and this information, this technology.  And Mr. Griffith knew

14    that in advance, was told that he was not permitted to travel

15    to North Korea, did so anyway, in direct contravention of that

16    guidance.  That goes directly to Mr. Griffith's risk of flight.

17    It shows that he is not --

18         THE COURT:  Let's take a step back.

19         In terms of the current charges, what are the

20    guideline ranges for the current charges?

21         MR. KROUSE:  Your Honor, we had done a preliminary

22    guideline range.  It is somewhere in the range of 14 to 20

23    months, I believe.  So --

24         THE COURT:  And does the government have any current

25    plans to add charges that would increase that guideline range?

Case 2:19-cr-00877-CCC Document 36-6 Filed 01/31/20 Page 27 of 56 PageID: 523
Case 1:20-cr-00015-PKC Document 12 Filed 02/08/20 Page 29 of 58

Jcudgrih

1          MR. KROUSE:  It's very possible, your Honor.  As you

2     know, the government's investigation is ongoing, and we are

3     extracting information from the phones, etc., that will

4     possibly lead to further charges.

5          THE COURT:  OK.  But I guess the question is do you

6     have a current -- anything is possible, Mr. Krouse, as you

7     know.  So what I'm trying to gauge, because part of the

8     risk-of-flight analysis at least that I am considering is how

9     much time -- how much exposure Mr. Griffith is facing.  So,

10    that's what I'm trying to assess here.

11         So it sounds like you can't say right now

12    definitively.  The government is continuing its investigation,

13    and there may or may not be additional charges.

14         MR. KROUSE:  That is correct, your Honor.  And to be

15    clear, the case is not even indicted yet.  The only question

16    here is whether the government has established by a

17    preponderance of the evidence that the defendant poses a flight

18    risk and we think we have.

19         Well, with respect to the exposure that he faces, even

20    though the guidelines' range isn't tremendously high, it does

21    call for jail time.  And Mr. Griffith, in combination with all

22    of the other factors, the government believes the prospects of

23    jail time, the prospect of being convicted of this very serious

24    charge, the prospect -- and looking at the government's

25    strength of its case, there would be a strong incentive for him

Case 2:19-cr-00877-CCC Document 36-6 Filed 01/31/20 Page 28 of 56 PageID: 5242
Case 1:20-cr-00015-PKC Document 12 Filed 04/08/20 Page 30 of 58    27
Jcudgrih

1    to flee, especially in light of the fact that even before he

2    was charged here, Mr. Griffith had expressed interest in and

3    explored the possibility of renouncing his citizenship.  He

4    does not have significant ties to the United States.  He

5    doesn't live here.  He lives --

6            THE COURT:  The parents would probably beg to differ.

7            MR. KROUSE:  The parents can travel to visit him.

8            He himself does not maintain ties to the United

9    States.  He was going to renounce his citizenship.  He was not

10   living here, he was living abroad.  He doesn't have a job here.

11           So in the calculus of the flight risk, which the Court

12   is looking at, the lack of significant ties to the United

13   States, the fact that the government's case is extremely

14   strong, and the fact that a conviction on this charge would

15   carry jail time, the fact that notwithstanding defense

16   counsel's arguments, it's still extremely unclear what

17   Mr. Griffith's financial resources are.  Most of those

18   financial resources are held in a manner that's difficult to

19   trace, that's difficult to fully know.  There are text message

20   indications that Mr. Griffith is far wealthier than he's

21   claiming today.  He could use those funds to effectuate a plan

22   to flee the United States and live abroad.

23           The St. Kitts and Nevis passports issue, it's known

24   that St. Kitts provides citizenship to individuals who make

25   investments in their country.  And even if St. Kitts has an

Case 2:19-cr-00877-CCC Document 36-6 Filed 01/31/20 Page 29 of 56 PageID: 525
Case 1:20-cr-00015-PKC Document 12 Filed 03/08/20 Page 30 of 56   28
Jcudgrih

1    extradition treaty with the United States, the point is that

2    Mr. Griffith would be able to obtain a St. Kitts' passport

3    which he could then use to travel to other countries that do

4    not have an extradition treaty with the United States, and he's

5    smart enough to do that.

6            The fact that he --

7            THE COURT:  Do you know, in connection with that, does

8    he actually need to present his passport, in other words, to

9    the authorities in St. Kitts or in Nevis?

10           MR. KROUSE:  I don't believe so, your Honor.  I think

11   it is purely a transactional passport.  You put money in and

12   then you get a St. Kitts passport, no questions asked.

13           Similarly, Mr. Griffith's familiarity with the Dark

14   Web is extremely significant.  The fact that he's the developer

15   of a tool used to navigate the Dark Web obviously shows that he

16   is very familiar with it.  Defense counsel made the point that

17   the Dark Web can be used for legitimate purposes.  That's

18   assuredly true, like any tool can be used for legitimate

19   purposes, but primarily the Dark Web is use for illicit

20   purposes, to include purchasing false identifications; that's

21   certainly something someone can do over the Dark Web.

22   Mr. Griffith would be able to, if released, access the Dark Web

23   and obtain travel documents in order to flee the prosecution.

24   That in the government's view shows that simply asking him to

25   give up his passport would not be sufficient protection against

1    him fleeing the jurisdiction.

2         Also, your Honor, the electronic monitoring that the

3    defense is relying heavily on is obviously not foolproof.  Your

4    Honor is well aware that in the last three years at least ten

5    individuals have fled on bail by cutting their electronic

6    bracelet and disappearing even though they had electronic

7    monitoring and they had given up their passports.  So this is

8    not some theoretical concern.

9         Mr. Griffith, for all the reasons that we've laid out,

10   his lack of significant ties to the United States, his

11   unexplained or unknown financial resources poses such a risk,

12   and there are no conditions that can reasonably assure that he

13   won't flee the jurisdiction if he is released on bail.

14        THE COURT:  OK.  All right.  Thank you.

15        Yes.  Mr. Klein, would you like to speak to what the

16   government said?

17        MR. KLEIN:  Very briefly, your Honor.

18        THE COURT:  Yes.

19        MR. KLEIN:  This is a high-profile case.  He's been

20   all over the media.  If he flees, he's going to lose his job.

21   You know, they are going to fire him if he flees, just to be

22   clear.  So he said his job located abroad, but if he flees, he

23   losses that job.

24        He doesn't have significant resources there.  What's

25   disclosed to Pretrial is I think approximately $250,000, your

Case 2:19-cr-00877-CCC Document 36-6 Filed 01/31/20 Page 31 of 56 PageID: 527
Case 1:20-cr-00015-PKC Document 12 Filed 02/08/20 Page 30 of 55

Jcudgrih

1     Honor.

2            His parents and his sister, if the way your Honor is

3     leaning is any indication -- or might lead, I don't want to

4     presume anything -- would lose their homes.  These are his --

5     they have a very tight-knit loving family.  So he would be

6     throwing away his job, the rest of his life, his parents'

7     homes, plus any future he might have, and looking at

8     significantly more time than he is now, which is relatively

9     low, if he chose to flee.

10           THE COURT:  And with regard to the accounts, putting

11    aside the hard currency accounts or savings accounts that

12    Mr. Griffith has, the cryptocurrency accounts or wallets, do

13    you have a sense of how many of those there are?

14           MR. KLEIN:  Your Honor, we actually -- the government

15    did raise this concern with us when we initially asked if there

16    were any bail conditions, and we mentioned that there might be

17    wallets back in his residence in Singapore.  And we were told

18    that if went to his apartment, that could be obstructing

19    justice, just so you know.  So I don't have -- not that we have

20    held back because we don't think it would be obstructing

21    justice, but we're not exactly sure what's there but what he

22    disclosed is accurate.  We're not sure what is there.  But, I

23    mean, what he disclosed on the Pretrial report is a coin-based

24    account, a Singapore account, and he has cold wallets, which

25    are basically like drives you would take and not attached to

1    the Internet that I believe are located in his residence, but I

2    believe that is under a hundred-thousand dollars.  He would

3    have to get back into Singapore from here.  There is no way the

4    Singapore authorities are going to let him into Singapore.

5              And I want to address a couple of points.

6              THE COURT:  In other words, your point is that he

7    can't access that?

8              MR. KLEIN:  He can't access that, your Honor, as far

9    as I know.

10             And, your Honor, the Tuscaloosa -- this idea that he

11   is going to go and get a St. Kitts passport, first of all, pure

12   speculation about how you get one.  My understanding is you

13   have to go to a St. Kitts embassy with your current passport.

14   If he is in Tuscaloosa, I can guarantee -- I haven't looked it

15   up -- there is no St. Kitts embassy there.  Now, there is one

16   here, I am sure.  But I don't think that is realistic.

17             The government also brought up he was going to

18   renounce.  He engaged in some potentially limited discussions.

19   He didn't do it.  Instead, he got a residence in Puerto Rico,

20   which is part of the United States.  So I think that's

21   misleading also.

22             Overall, I think if you look at the record here, the

23   low guidelines, his strong ties to the United States, his

24   cooperation with law enforcement throughout this investigation,

25   including remaining here in this country at their direction and

Jcudgrih

1    not leave and providing them with information, shows that he is

2    a strong candidate for bail and should be out and that he will

3    comply with your Honor's orders and make all his court

4    appearances.  And I assure you he wants to clear his name, and

5    we have a lot of evidence that we believe we are gathering to

6    support him.  And we dispute strongly the government's idea

7    that they have a strong case about this.  And so we're not

8    engaged in a merits hearing, but I just want you to know we

9    feel very strongly about that, your Honor.

10            THE COURT:  OK.  All right.  Thank you.

11            Yes, Mr. Krouse.

12            MR. KROUSE:  And, Judge, just to correct one thing I

13   had previously said.  The guidelines' range, the initial

14   calculation is 15 to 21 months, which is not extremely low by

15   the standards of this district.

16            I will also note that Mr. Griffith does have a

17   girlfriend in Singapore.  So the notion that he does not have

18   ability to access his funds in Singapore we think is belied by

19   that in part and belied also by the fact that if he was able to

20   obtain false identification, he would be able to travel on that

21   false identification to Singapore in order to access his funds.

22            THE COURT:  OK.  Well, I understand Magistrate Judge

23   Moses' concerns, however, there are several factors I think

24   that militate in the favor of granting a significant bond here.

25            Number one, you know, Mr. Griffith reported himself to

Case 2:19-cr-00877-CCC Document 36-6 Filed 01/31/20 Page 34 of 56 PageID: 5303
Case 1:20-cr-00015-PKC Document 32 Filed 02/08/20 Page 36 of 58

Jcudgrih

1    the State Department when he returned that he in fact took this

2    trip. I don't know exactly what the details of that were. And

3    he voluntarily met with law enforcement on two occasions and

4    was in the process of arranging a third meeting, apparently,

5    through counsel at the time.

6           And so it is a combination, I think, of -- and I don't

7    know how, I won't characterize it. But on the other side, you

8    have the statements that he makes in some of these texts that

9    are extremely concerning, but I think that they can be -- in

10   terms of his flight, my sense is that a bond secured by his

11   parents' home and his sister's home, strict Pretrial

12   supervision. And the bond will be -- I know they said 800,000,

13   but I want to make it a $1 million bond cosigned by the

14   defendant's father, his sister, and his mother. I don't know

15   whether -- and as well as secured by the homes, strict Pretrial

16   supervision, electronic monitoring, limited access to -- well,

17   I guess what I would ask the parties to meet and confer about

18   is whether there is an ability in some cases -- in one case I

19   had, there was actual monitoring. In other words, to the

20   extent that a defendant utilized a computer, he was actually

21   monitored realtime by the government, or whatever limitations

22   there would be on computer access that would make sense.

23          I would like the parties to meet and confer about the

24   wallets that are in Singapore and the other cryptocurrency

25   accounts that Mr. Griffith has and come to some sort of

1    agreement on how to secure those so that Mr. Griffith cannot

2    have access to them either through the Internet or through

3    physically getting the hard drives and the like, and I hope

4    that would alleviate any issue about tampering and the like.

5    If need be, with regard to certain ones that are accessible

6    through the Internet but that need a key, or some other thing,

7    that Mr. Griffith should comply with providing that, and, if

8    need, be that can be held in escrow by his counsel.

9             I think that it does make sense that the conditions

10   get met prior to Mr. Griffith's release.  I would encourage the

11   government to, with regard to the properties, to do -- well, to

12   avoid an issue that happened to me in another case where there

13   were properties that were posted and in the end what ended up

14   happening was -- and I'm not saying anything, Dr. Griffith,

15   about your properties, but what ended up happening was that

16   there were so many tax liens on the property that when they

17   went -- because the defendant fled and actually is currently a

18   fugitive, and when he fled and the bond was revoked, there was

19   no equity in the houses.  So it was of limited value to

20   actually keep the defendant in this country, and,

21   unfortunately, that's something that I don't think -- it didn't

22   seem that the government became aware of or I became aware of

23   until after the fact.

24            So, do the appraisals, do whatever the standard is

25   now, Mr. Krouse, to make sure, with regard to the properties,

Case 2:19-cr-00877-CCC Document 36-6 Filed 01/31/20 Page 36 of 56 PageID: 532
Case 1:20-cr-00015-PKC Document 12 Filed 02/08/20 Page 36 of 56    35
Jcudgrih

1    that they are adequately securing the bond.

2           Travel will be limited -- well, I think, on balance,

3    while Mr. Griffith could live here in New York, I haven't heard

4    compelling arguments that New York would necessarily be better

5    than Alabama.  What I do believe is that the more sway that his

6    parents will have over him in Alabama will be stronger if he is

7    there, as opposed to if he's here in New York.  So, you know, I

8    think that allowing him to live with his parents, as opposed to

9    living with right now a friend here whose welcome he may or may

10   not -- depending on how long the case is, that could be a

11   significant amount of time, and I foresee that there may be

12   issues with regard to that.

13          With regard to Mr. Griffith's traveling up here for

14   court appearances, I will leave it to the parties whether it is

15   Pretrial -- I was actually thinking -- and, again, the defense

16   would have to consent to this, but there would be even an agent

17   or two from the FBI down there to basically make sure that he

18   gets on the plane he is supposed to get on.  I don't know what

19   the flight situation is or isn't, but I would ask the parties

20   to consider that and whether it could be Pretrial also that

21   would escort him to the airport.  So, Mr. Krouse, I would like

22   you to investigate that and see what is the most feasible and

23   what makes the most sense with regard to that.

24          MR. KROUSE:  Yes, your Honor.

25          THE COURT:  Let me just take a look.

Jcudgrih

```
 1              So the travel will be restricted to the Southern
 2   District of New York and the Northern District of Alabama.
 3              MR. KLEIN:  Your Honor.
 4              THE COURT:  Yes.
 5              MR. KLEIN:  I have just a few clarifications.
 6              THE COURT:  Yes.
 7              MR. KLEIN:  I am in the Central District of
 8   California.  Would he be permitted to visit his law firm in the
 9   Central District of California?
10              THE COURT:  I know that was included.  The answer is
11   yes, but it has to be coordinated specifically with the
12   government.  In other words, it has to be of limited duration.
13   The government needs to know where he will be staying in
14   California.  You will provide them with an itinerary in
15   advance.
16              MR. KROUSE:  Your Honor, if I may just be heard on
17   this, since it didn't come up in the initial argument?  The
18   government does oppose that condition.  If he is to be released
19   to the Northern District of Alabama, he should be restricted to
20   that district and to this district, and if Mr. Klein needs to
21   meet with him in person, he can travel to Alabama.
22              THE COURT:  Mr. Klein, I understand the logistical
23   issues that that would present, but it is -- is Mr. Buckley
24   going to continue in this case, do you know?
25              MR. KLEIN:  Yes, your Honor.
```

Case 2:19-cr-00877-CCC Document 36-6 Filed 01/31/20 Page 38 of 56 PageID: 534
Case 1:20-cr-00015-PKC Document 52 Filed 02/08/20 Page 40 of 52

Jcudgrih

1          THE COURT:  All right.  So what I would suggest is

2     this, at least initially, and I will leave it up to you -- and

3     I don't know when the case might be indicted, but you can

4     revisit it at some further time if in fact Mr. Griffith has had

5     a clean record in terms of Pretrial Services and visiting.

6          So it will be limited to this district, that district.

7     To the extent you meet with him, you can meet with him here or

8     down in Alabama.

9          Yes?

10         OFFICER AHMED:  Your Honor, in terms of you mentioned

11    conditions need to be fulfilled before he is released.  We

12    would ask that it just be the bond condition for a million

13    dollars, because getting to Singapore with the logistics and

14    getting into his apartment, that could take a long time and I

15    don't want to delay this any longer.

16         THE COURT:  I think it is the bond and the securing of

17    the bond.  I don't know what it is going to take and whether

18    the Singaporean -- the authorities in Singapore would have to

19    be involved in actually securing that.  But what I would say is

20    this.

21         Mr. Klein, to the extent that Mr. Griffith's

22    girlfriend has access to his apartment, it should be made clear

23    to her that those things are not to be touched, that, in

24    essence -- do you know, does she live in the apartment?  I

25    don't want to pry, but what I'm saying is basically I'm setting

Jcudgrih

1    it down right now:  If anything happens to those materials

2    between now and when you've reached an agreement, that's going

3    to present a problem for Mr. Griffith.  Obviously, nothing I

4    can do to someone in Singapore but I certainly can do something

5    here.

6         MR. KLEIN:  Your Honor, and the other thing is

7    regarding the access, since he is not going to be permitted to

8    visit me immediately, I would ask that he be granted email with

9    counsel, at a minimum, unmonitored.  Because, I mean, that

10   would pose a real problem both for Mr. Buckley and myself if we

11   were to work on this case if we can't send him documents and

12   exchange emails and ideas.  And so I understand you want some

13   conditions on his monitoring, we should work with the

14   government.  But I want to be very clear, it would be very hard

15   for us to agree ever to not be able to email with him, because

16   I have had that before and it made it very difficult in cases.

17        THE COURT:  I think that there are certain -- well, I

18   don't know exactly how it was done in the other case that I

19   had.  And, Mr. Krouse, it was the Ng case.  I don't remember

20   what sort of access he had to a computer, but there may be ways

21   to limit sort of approved emails and the like which would

22   include counsel.

23        MR. KLEIN:  OK.  I just want to make sure.  I mean,

24   our concern is being able to communicate and work on his

25   defense with him.

Case 2:19-cr-00877-CCC Document 36-6 Filed 01/31/20 Page 40 of 56 PageID: 536
Case 1:20-cr-00015-PKC Document 32 Filed 02/08/20 Page 42 of 52

Jcudgrih

1            THE COURT:  Yes.

2            MR. KROUSE:  Your Honor, you mentioned strict

3    monitoring.  We would ask for home confinement while in

4    Alabama.

5            THE COURT:  Let me hear from Mr. Klein.  Yes.

6            MR. KLEIN:  I think home confinement is unnecessary,

7    your Honor.  I mean, he is in Tuscaloosa at his parents' house.

8    He is going to be electronically monitored.  There is, from

9    what Mr. Griffith, his father, is saying, there is a regional

10   airport there.  If he cut his bracelet, which he is not going

11   to do, that activates an alarm.  Whether he does it at home

12   or -- you know, they are going to be monitoring.  Maybe he

13   stays within the confines of the Tuscaloosa region or

14   something, but home confinement is really restrictive and I

15   think it is unnecessary at this juncture.

16           THE COURT:  Let me hear -- are you the Pretrial

17   Services Officer?

18           OFFICER AHMED:  Yes, your Honor.

19           THE COURT:  Officer?  I'm sorry.

20           OFFICER AHMED:  Mohammed Ahmed.

21           THE COURT:  OK.

22           OFFICER AHMED:  Your Honor, may I approach the bench?

23           THE COURT:  Yes.

24           (Discussion off the record at the sidebar between the

25   Court and Officer Ahmed)

1          THE COURT:  I just need to make sure what I'm actually

2     ordering is something that we can actually do.  I am just going

3     to take a few seconds to speak to the Pretrial Services Officer

4     to make sure I have the language correct.

5          With regard to -- I think, yes, you should be able to

6     communicate with your client via email.  I think, though, his

7     access electronically and the computer should be limited.  And,

8     again, I'll speak with the Pretrial Services Officer.  So, I

9     will be right back.

10          (Discussion off the record in the robing room between

11     the Court and Officer Ahmed)

12          THE COURT:  You can be seated.

13          All right.  So I think I have some of the language

14     down, and some of the things, the parties have some additional

15     work to do.

16          So it is going to be a million-dollar bond secured by

17     the parents -- Mr. Griffith's parents' and his sister's home.

18     There will be strict Pretrial supervision, which will require,

19     Mr. Griffith, at least two in-face visits with the Pretrial

20     Services Officer down in the Northern District of Alabama, as

21     well as other restrictions.

22          The limitation on computer access, my understanding is

23     that Pretrial's ability is very limited.  It is sort of -- it

24     would be software that basically shows where someone has

25     visited, so it's basically not realtime.  So I will leave it

Case 2:19-cr-00877-CCC Document 36-6 Filed 01/31/20 Page 42 of 56 PageID: 538
Case 1:20-cr-00015-PKC Document 12 Filed 02/08/20 Page 42 of 56
Jcudgrih

1    to -- I would ask the government, in conjunction with the FBI,

2    to figure out what exactly can be done to either limit the

3    access -- I mean, obviously, the most critical thing is that

4    Mr. Griffith be able to communicate with his lawyers via email.

5    I don't know what the computer situation is at the home, but he

6    should be obviously restricted from accessing any of his

7    cryptocurrency accounts, to the extent he is able to do that

8    over the Internet.  There should be a restriction on accessing

9    the -- and I don't know exactly what this means, but the Dark

10   Web also in connection with that.  But I ask the parties to

11   meet and confer about that to see what is actually feasible.

12           Again, Mr. Krouse, I don't know exactly what was done

13   in the Ng case, but I know that there was monitoring that was

14   done there and the defendant had limited access to a computer

15   in that circumstance.

16           MR. KROUSE:  Yes, your Honor.  I would think that is

17   wholly appropriate here.

18           The concern is that using VPNs and anonymizing

19   software, which Mr. Griffith is very familiar with, it is close

20   to impossible to monitor his computer access.

21           I would say that as part of his bail conditions, he

22   should just be blanketly restricted from accessing any

23   computer, including emails from his counsel.  Counsel can

24   communicate with him by phone.  They can send him stuff by

25   mail.  But there isn't some overriding reason why he needs to

Case 2:19-cr-00877-CCC Document 36-6 Filed 01/31/20 Page 43 of 56 PageID: 5394
Case 1:20-cr-00015-PKC Document 12 Filed 02/08/20 Page 43 of 56

Jcudgrih

1   communicate by email with his counsel.  So I think the blanket

2   prohibition on any access to any computer, any cell phone that

3   has computer access or Internet access is appropriate here in

4   light of the concerns.

5          THE COURT:  OK.  I mean, I'm not going to -- again,

6   while I understand the concern, I will limit his access to a

7   computer, but I will allow him to communicate with his counsel.

8          So what I would suggest is the following -- and it may

9   be a limitation that has to be on the household itself, I don't

10  know, and I understand the concern there, but I have to

11  juxtapose that against Mr. Griffith's Sixth Amendment right and

12  his ability to communicate with counsel and review documents

13  that are sent by the government sort of realtime, as opposed to

14  having to wait for it to be mailed to him.

15         MR. KROUSE:  It can be overnighted, your Honor.  I

16  mean, there isn't, I don't believe, a Sixth Amendment right to

17  receive email from counsel.

18         THE COURT:  Again --

19         MR. KROUSE:  The documents can be overnighted.  I

20  mean, it is routinely done that people can get access to

21  physical documents in an extremely quick manner.  So to carve

22  out email with counsel, I think it is already very challenging

23  from a logistical standpoint to address the concern that your

24  Honor is rightfully finding with the defendant using the

25  Internet.  There isn't any reason to carve out emails with

Case 2:19-cr-00877-CCC Document 36-6 Filed 01/31/20 Page 44 of 56 PageID: 540
Case 1:20-cr-00015-PKC Document 12 Filed 02/08/20 Page 46 of 58    43
Jcudgrih

 1    counsel.  Mr. Klein just stated that in a previous case of his

 2    a court did impose that limitation and required him not to have

 3    access to email with his counsel.

 4            So I don't see that as being a particularly compelling

 5    concern personally.  I think things can be overnighted.  He can

 6    literally have them the next day and can talk over the phone

 7    with his counsel, if that's the issue.

 8            THE COURT:  OK.  But I'm not in the same place that

 9    you are, so I'm going to allow him to communicate with counsel

10    via email.

11            With regard to -- the defendant is to surrender his

12    travel documents.  And, again, do you know where the passport

13    is?

14            MR. KLEIN:  It was given to Pretrial in LA.  They

15    said, I believe, they were going to email to Pretrial here so

16    it must be in transit.  Pretrial can coordinate among

17    themselves.

18            THE COURT:  OK.  And I think that would include the

19    passport card.  I know that is going to create certain issues

20    because that may be the only identification -- well, does your

21    client have a driver's license?

22            MR. KLEIN:  No, your Honor.  The passport ID was his

23    ID, and so that was why -- Pretrial gave it to us in LA, your

24    Honor, to hold because it was his only ID.  I don't believe

25    that allows -- the passport ID allows for international travel,

Case 2:19-cr-00877-CCC Document 36-6 Filed 01/31/20 Page 45 of 56 PageID: 541
Case 1:20-cr-00015-PKC Document 12 Filed 02/08/20 Page 45 of 56
44
Jcudgrih

 1    but I haven't looked at it.

 2              MR. KROUSE:  He can go to Mexico or Canada with the

 3    passport ID.  He would definitely, in the government's view,

 4    need to surrender his passport ID.

 5              MR. KLEIN:  Again, we think he should be allowed to

 6    have it, but if your Honor ordered, we can give it to Pretrial

 7    and they can have it in Alabama.

 8              THE COURT:  And then he only is allowed access to it

 9    when he is going to be traveling to New York for court

10    appearances or to visit with his lawyers?

11              MR. KLEIN:  Yes, your Honor.

12              THE COURT:  From Pretrial's perspective?

13              OFFICER AHMED:  We would recommend that he surrender

14    the document and find either state-issued documents or

15    city-issued documents.

16              THE COURT:  Why don't we do this?  The document will

17    be surrendered to Pretrial.  If it turns out, Mr. Klein, that

18    Mr. Griffith -- and I'll allow -- so it will be home detention

19    with GPS monitoring.  I will allow, though, as part of home

20    detention, after communicating with Pretrial -- I think he is

21    going to need personally to go and get the state-issued ID.

22              OFFICER AHMED:  Right.  I believe those things can be

23    obtained through other documents such as a birth certificate,

24    school records, things of that nature.

25              THE COURT:  All right.

1        So travel will be limited to the Southern and Eastern

2   District of New York, because, as the Pretrial Services Officer

3   points out, the airports here are in the Eastern District of

4   New York, and the Northern District of Alabama.  And travel up

5   here is limited to for court visits and to have attorney

6   visits.

7        Mental health treatment and evaluation as directed by

8   Pretrial.  Drug testing and treatment as directed by Pretrial.

9   As I said, home detention with GPS monitoring.

10       He is to reside with his parents, and he is not to

11  relocate without prior approval of Pretrial Services.

12       In connection with that, Dr. Griffith, they are going

13  to need to do a home assessment of your home, and that just

14  means that someone is going to visit.  So, you know, once the

15  order is issued, the Pretrial Services Officer will communicate

16  with you and it will be somebody probably from Alabama; the

17  Alabama Pretrial Services will come to your home to visit.

18       Mr. Griffith, you are to avoid contact -- and, again,

19  I don't know if there are any -- with any victims and/or

20  witnesses here.

21       And, obviously, Mr. Krouse with regard to the

22  witnesses, you may need to communicate with defense counsel so

23  they have an understanding of people who aren't necessarily

24  obvious from the complaint.

25       MR. KROUSE:  Yes, your Honor.

Case 2:19-cr-00877-CCC Document 36-6 Filed 01/31/20 Page 47 of 56 PageID: 5346
Case 1:20-cr-00015-PKC Document 112 Filed 03/08/20 Page 49 of 58
Jcudgrih

1              THE COURT:  Yes.

2              MR. KLEIN:  Your Honor, we would request a list.  It

3    isn't obvious from the complaint who that would be, and he has

4    lots of friends, you know, who he may communicate with.  We

5    just want the government to provide us a list of people.

6              THE COURT:  I guess, Mr. Krouse, it is sort of half a

7    dozen/one, right?  So it is up to you.  You either provide the

8    list -- and I know it is in advance of when you would

9    necessarily provide a list of witnesses, or to decide not to,

10   but then, you know, I think the victims, I think it may be that

11   the defendant doesn't necessarily know who the witnesses are.

12   So, I will leave it up to the government to figure out.

13             MR. KROUSE:  Yes, your Honor.  We'll consider it.  We

14   may not give a list, and then, of course, any witness tampering

15   or obstruction of justice are separate crimes and so we can

16   address it in that way.

17             THE COURT:  Yes.  Obviously, I'm not in any way

18   limiting whatever defense counsel believes they can do,

19   consistent with their representation of Mr. Griffith and

20   consistent with the law.  So I am not saying you can't, you

21   know, do your own research, speak to folks if you want to speak

22   to folks, or try to speak to folks, I should say.  That is not

23   a limitation I am placing on him.

24             OK.  So those are the conditions.  As I mentioned, the

25   conditions that need to be met are the bond conditions,

Case 2:19-cr-00877-CCC Document 36-6 Filed 01/31/20 Page 48 of 56 PageID: 544
Case 1:20-cr-00015-PKC Document 12 Filed 02/08/20 Page 50 of 58

Jcudgrih

1  including getting the paperwork for securing the homes, but not

2  the -- oh, I'm sorry.  Obviously, I mentioned the securing of

3  the cryptocurrency accounts and/or hard drives, and I will

4  leave that up to the government and the Bureau to figure out

5  how to do that consistent with whatever the laws are in

6  Singapore and consistent with the government's concern about

7  preserving evidence and tampering with evidence.

8          Yes, Mr. Klein.

9          MR. KLEIN:  Your Honor, just to be clear, the

10 million-dollar bond is what needs to be fulfilled for him to be

11 released; cryptocurrency we will deal with separately?

12         THE COURT:  That is correct.

13         MR. KLEIN:  OK.

14         THE COURT:  But the bond is connected to the house.

15 The cryptocurrency and the like I think might take longer and I

16 understand that.  But it is with the caveat, as I said, anyone

17 who has access to the apartment, Mr. Klein, you should do your

18 best to put on notice that they shouldn't be touching that

19 stuff.

20         OK.  Yes?

21         OFFICER AHMED:  Your Honor, we're also requesting that

22 the home assessment be completed prior to release.

23         THE COURT:  Yes, and the home assessment.  I don't

24 anticipate that should be an issue, Mr. Klein.  If it ends up

25 being an issue, just let me know, but I think the home

1   assessment.  That's just so that -- that typically is what

2   happens so that they sign off on the location.

3           MR. KLEIN:  Yes, I am familiar with that, your Honor.

4           THE COURT:  OK.  All right.

5           Is there anything else I need to deal with?

6           MR. KROUSE:  No, your Honor.  Thank you.

7           THE COURT:  OK.

8           MR. KLEIN:  No, your Honor.  Happy new year.

9           THE COURT:  And what I should say is the following.

10  Obviously, this is not my case, or at least I don't know

11  whether it is going to be my case.  But, you know, if there are

12  applications, obviously those applications can be made to the

13  district court judge, whoever gets it.  To the extent there are

14  applications within the ruling that I made today, you know, and

15  the case is still on a complaint, I can deal with those until

16  such time as the case gets indicted, even when I'm no longer on

17  Part I.  I will put it that way.  OK?  I mean, it just makes

18  sense because I already am familiar with the case.

19          MR. KROUSE:  Yes, your Honor.  That is fine with the

20  government.

21          MR. KLEIN:  Yes, your Honor.  That works for the

22  defense.

23          THE COURT:  Thank you very much.  We'll stand

24  adjourned.

25          (Adjourned)

Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------X
                                       :
                                       :
UNITED STATES OF AMERICA,              :        19 Mag. 10987
                                       :
            -v-                        :        ORDER
                                       :
VIRGIL GRIFFITH,                       :
                      Defendant.       :
                                       :
                                       :
---------------------------------------X

```
┌──────────────────────────────────┐
│ USDC SDNY                         │
│ DOCUMENT                          │
│ ELECTRONICALLY FILED              │
│ DOC #: _____            │
│ DATE FILED: _1/2/2020_            │
└──────────────────────────────────┘
```

VERNON S. BRODERICK, United States District Judge:

        Before me is the Defendant's appeal of the denial of his
bail application by Magistrate Judge Barbara Moses on December
26, 2019.  I heard the appeal on December 30, 2019.
Accordingly, it is hereby:

        ORDERED that the Clerk of Court is directed to unseal this
case and enter all documents in connection with this Complaint
on the electronic docket.

        IT IS FURTHER ORDERED that for the reasons stated on the
record on December 30, the Defendant's appeal is GRANTED.  I set
forth below the entirety of Defendant's bail conditions:

        1.    A $1 million personal recognizance bond, secured by

              (1) the residence of the Defendant's parents, Dr.

              Robert Griffith and Dr. Susan Griffith, located at

              10885 Landers Drive, Northport, AL 35473; and (2) the

              residence of Defendant's sister, Joy Lewis, located at

7112 Black Rock Court, Columbia, MD 21046.  Dr. Robert Griffith, Dr. Susan Griffith, and Joy Lewis are to assist the Government in obtaining documents it deems necessary to make these properties security for the bond.  The bond shall not be considered secured until such time as the property has been assessed by the Government and has been made security for the bond. Defendant shall not be released until the conditions set forth in the paragraph are met;

2.    Strict Pretrial Supervision;

3.    Home detention with electronic and GPS monitoring at Defendants' parents' residence, located at 10885 Landers Drive, Northport, AL 35473 ("the Residence");

4.    Home assessment of the Residence.  Defendant shall not be released until the conditions set forth in the paragraph are met;

5.    Defense counsel and the Government are to meet and confer about securing the cryptocurrency hard drives located at the Defendant's apartment in Singapore, subject to the laws of Singapore.  Defendant is to ensure that all individuals who have access to his apartment in Singapore are aware that these drives are not to be accessed, touched, or tampered with in any

way until they are secured based upon the agreement
between defense counsel and the Government.

6.   Defendant is to participate in mental health treatment
     and evaluation as directed by Pretrial Services;

7.   Defendant is to participate in drug treatment and
     testing as directed by Pretrial Services;

8.   Defendant's travel is restricted to the Northern
     District of Alabama, the Southern District of New York
     ("SDNY"), and the Eastern District of New York ("EDNY"
     and together with SDNY, the "New York Districts").
     Further, Defendant shall only be permitted to travel
     to the New York Districts to (a) appear at the
     Thurgood Marshall United States Courthouse at 40
     Centre Street, New York, New York and the Daniel
     Patrick Moynihan United States Courthouse at 500 Pearl
     Street, New York, New York for court appearances or as
     directed by his Pretrial Services Officer; or (b) meet
     with his counsel, Brian Klein, of Baker Marquart LLP
     and/or Sean Buckley of Kobre & Kim, and/or any other
     representatives of the aforementioned firms, at the
     New York office of Kobre & Kim located at 800 Third
     Ave., New York, New York 10022.  Defendant shall
     provide notice to and obtain approval from Pretrial
     Services for all such travel.  To the extent the

3

Government deems it necessary, in connection with all visits to and from the New York Districts, Defendant shall be accompanied to the airport by an agent of the Federal Bureau of Investigation or other investigative agency designated by the Government, who shall ensure that he boards his flight;

9.  Within the Northern District of Alabama, Defendant shall be permitted to leave the Residence for all purposes ordinarily permitted for a person in home detention, as well as to obtain state- or municipality-issued identification documents. Defendant shall provide notice to and obtain approval from Pretrial Services for all such departures from the Residence;

10. Defendant is to surrender all of his travel documents to Pretrial Services, including his Passport ID Card. Upon release, and in accordance with Condition No. 9, Defendant is to commence efforts to obtain a state- or municipality-issued identification card that will enable him to travel by air.  Until Defendant obtains an alternate form of identification, Pretrial Services will facilitate his travel to the New York Districts for the purposes authorized in Condition No. 8 by providing Defendant with his Passport ID Card no more

4

than one day prior to his flight, which he will surrender to Pretrial Services upon his initial arrival in the SDNY, and retrieve his Passport ID Card from Pretrial Services for his trip back to Alabama. Defendant shall within a day of returning to the Northern District of Alabama return his Passport ID Card to Pretrial Services in the Northern District of Alabama.

11. Defendant is not to relocate from the Residence without prior approval of Pretrial Services;

12. Defendant shall not possess or use any smartphone or any cellular telephone with internet access capability;

13. Defendant will be allowed to have a computer in the Residence, which will be loaded with a monitoring software. Defendant is not to use any computer or other internet-capable device that does not contain such software;

14. Defendant's internet activity will be limited to communicating with his counsel by e-mail. Defendant is not to access the internet for any other purposes, and is specifically prohibited from accessing any of his cryptocurrency accounts and from accessing the darkweb;

15.  Defendant is not to communicate with or contact any of
     the witnesses and victims set forth in a list to be
     provided by the Government.


SO ORDERED.

Dated:     New York, New York
           January 2, 2020

                                    _____
                                    Vernon S. Broderick
                                    United States District Judge PART I