**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Claire C. Cecchi |
|  | : | Hon. Michael A. Hammer |
| v. | : | Crim. No. 19-877 (CCC) |
| MATTHEW BRENT GOETTSCHE [DEFENDANT TWO REDACTED] JOBADIAH SINCLAIR WEEKS JOSEPH FRANK ABEL SILVIU CATALIN BALACI | : : : | |

---

**GOVERNMENT'S SUPPLEMENTAL OPPOSITION TO
DEFENDANTS' MOTIONS FOR TEMPORARY RELEASE**

---

CRAIG CARPENITO
United States Attorney
970 Broad Street, Room 700
Newark, New Jersey 07102
(973) 645-2742

On the Brief:

David W. Feder
Jamie L. Hoxie
Anthony P. Torntore
Assistant United States Attorneys

The Government respectfully submits this brief to supplement its opposition, Dkt. #70, to motions for temporary release from detention pursuant to 18 U.S.C. § 3142(i) filed by Defendants Goettsche, Dkt. #64, and Weeks, Dkt. ##68 and 71. The motions are scheduled for argument on March 30, 2020.

In the three days since the March 24, 2020 telephone status conference on the pending motions, Dkt. #72, federal courts in New Jersey and nationwide have continued to address petitions for release on COVID-19 grounds in a variety of procedural settings. After a review of those decisions, the Government is not aware of an instance in which young, healthy defendants detained on clear risk of flight grounds have been granted temporary release from custody on the basis of COVID-19 concerns.[1] In addition, the Essex County Correctional Facility ("ECCF") continues to implement protocols aimed at mitigating the spread of COVID-19 and treating those infected.

The federal courts have assessed COVID-19-based release requests "on a case-by-case basis" and generally have declined to order temporary release under § 3142(i) "based solely on generalized COVID-19 fears and speculation." *United States v. Clark*, Crim. No. 19-40068, 2020 WL 1446895, at *3 (D. Kan. Mar. 25, 2020) (Ex. A). The magistrate judge in *Clark* articulated a useful four-part framework for considering COVID-19 § 3142(i) requests that the Government will follow here:

> (1) the original grounds for the defendant's pretrial detention, (2) the specificity of the defendant's stated COVID-19 concerns, (3) the extent to which the proposed release plan is tailored to mitigate or exacerbate other COVID-19 risks to the defendant, and (4) the likelihood that the defendant's proposed release would increase COVID-19 risks to others. The court will not necessarily weigh these factors equally, but will consider them as a whole to help guide the court's determination as to whether a "compelling reason" exists such that temporary release is "necessary." § 3142(i).

---

[1] On March 20, 2020, in *United States v. Cooper*, Crim. No. 19-122 (D.N.J.), Magistrate Judge Kiel granted bail for a supervised release violator upon finding an acceptable third-party custodian but specifically denied the defendant's request on COVID-19 grounds and stated on the record that granting bail on such grounds would set a "dangerous precedent." (transcript pending).

*Id.* at *3.

    *1. Original Grounds:* The Government addressed the previous basis for detention in its earlier submission and why Defendants failed "to demonstrate that the § 3142(g) factors considered at the time detention was ordered . . . have materially changed." *United States v. Eberhart*, Crim. No. 13-313, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) (rejecting request for compassionate release) (Ex. B). Defendants maintain access to considerable wealth and overseas contacts, have strong reasons to flee, and international travel is available through, among other things, commercial and private aircraft. Although U.S. Pretrial Services ("USPS") recommended Goettsche's release in advance of the February detention hearing, it would have required the satisfaction of conditions that likely cannot be met. For example, USPS would have required Goettsche to perfect liens on certain properties that the courts likely cannot grant due to COVID-19 shutdowns and the prioritization of more urgent court matters. Judge Hammer did not find those conditions sufficient previously; now that they likely cannot be met, the need for detention is correspondingly stronger.

    *2. Specificity of COVID-19 Concerns:* Weeks cited an asthma condition as placing him in a high-risk category for COVID-19. Although the Asthma and Allergy Foundation of America website indicates that asthma is not known to increase to risk of contracting COVID-19, it is believed that COVID-19, like other coronaviruses, can cause asthma episodes or attacks. *See* https://community.aafa.org/blog/coronavirus-2019-ncov-flu-what-people-with-asthma-need-to-know. Weeks did not report this condition during his medical intake at ECCF, Declaration of Alfaro Ortiz ("Decl."), ¶ 10, or on a health form he submitted for a mountain climbing trip to Antarctica, *see* Ex. C (not filed on ECF based on health and personal identifying information). His asthma did not prevent Weeks from traveling all over the world, including to remote locations that

2

presumably lacked standard respiratory treatment, and engaging in strenuous activities at altitude like heli-skiing and mountain climbing. The point is not that Weeks does not have asthma. Rather, it is that he did not report suffering from asthma or have a prescription for asthma treatment until COVID-19 surfaced.[2] Goettsche has not indicated any health condition that puts him at higher risk for COVID-19 illness.

The extensive measures adopted at ECCF to address COVID-19 are highlighted in the attached Declaration. ECCF has, among other things, screened staff, *id.* ¶ 27(o), contracted to obtain testing kits, *id.* ¶ 28(a), restricted visitors, *id.* ¶ 28(d)&(e)(i), and imposed quarantine procedures, *id.* at ¶ 28(e)(ii). ECCF has reported positive cases for two inmates in Delaney Hall, not where Defendants are housed, one inmate in an offsite medical facility, and several staff members. *Id.* ¶ 29. All positive cases are in quarantine, and there are currently no positive cases among the federal detainee population.

Defendants "cannot predict the extent to which COVID-19 cases might arise at the facility any more than many Americans can predict how they might be exposed to the virus" or "predict how [ECCF] might respond to an outbreak any more accurately than many Americans can predict how their local hospitals might respond." *Clark*, 2020 WL 1446895, at *6. Although "inmates may not be able to fully adhere to optimal social distancing guidelines, these circumstances are generalized to all individuals in the prison system and are not unique to" Defendants. *Id.* The same is true of the current strain on their ability to confer with counsel. They are at a facility that has implemented meaningful measures to try to minimize the likelihood of the virus entering the facility. Defendants have not articulated specific COVID-19 concerns warranting release.

---

[2] Weeks complained that he was reprimanded for adjusting an air vent. Impeding with air vents compromises ECCF's system for purging airborne particles. Decl. ¶ 25.

*3. Necessity of Release to Address Overall COVID-19 Risks:* Defendants cannot show that residing outside of ECCF *necessarily* makes them any safer from COVID-19, as § 3142(i) requires. *See id.* Goettsche would travel from New Jersey to Colorado by unspecified means to reside in his family home, exposing him to periodic close contacts with others during either ground or air travel. Weeks would reside in a private home in New Jersey, although the health circumstances of his proposed third-party custodian and any family with whom he may reside are unknown to the Government at this time. Neither addresses the capacity of the health care systems in those locations to detect and treat COVID-19 cases, or to predict with any accuracy how that capacity will change over the coming weeks. Defendants offer only unsupported assertions that they will be safer and better cared for outside ECCF, without comparing the measures for mitigation, detection, and treatment at ECCF. This factor is at best neutral.

*4. Impact on Others:* Courts considering temporary release under § 3142(i) on COVID-19 grounds have also evaluated "the likelihood that the defendant's proposed release plan would increase COVID-19 risks to others." *Clark*, 2020 WL 1446895, at *7. By releasing Defendants now, the Court would be showing remarkable faith in Defendants' promises not to flee, having found six weeks ago that Defendants could not be trusted to return to court. The world may have changed considerably since then, but Defendants' resources and motivations have not.

What has changed is the ability to supervise Defendants. In normal times, releasing serious, well-financed flight risks like Defendants would entail stringent monitoring. But "location monitoring is not a limitless resource, nor is its installation and monitoring by [USPS] officers without risk to those personnel (who must be trained and certified to install location monitoring) given the current recommendations regarding implementation of social distancing." *United States v. Martin*, Crim. No. 19-140, 2020 WL 1274857, at *4 (D. Md. Mar. 17, 2020) (Ex. D). Even the

4

simple procedure of affixing a location monitoring bracelet would expose USPS officers to unnecessary contact with potentially infected persons or risk them unwittingly infecting others. Current conditions are also limit and compromise the effectiveness of standard monitoring measures. The USPS offices in both New Jersey and Colorado have abided social distancing recommendations by adopting "virtual monitoring" though internet-enabled teleconference applications, which plainly is less effective than regular in-home visits or periodic in-person appointments in supervising high-risk flight candidates like Defendants. USPS officers cannot, for example, inspect Defendants' compliance with computer restrictions without access to the computer. Their monitoring is at the mercy of the defendant, who can choose whether or not to answer a check-in call.

Finally, should Defendants' violate their conditions of release, "law enforcement officers will be forced to expend valuable resources during a national crisis to take [them] back into custody," including from as far away as Colorado, and return them to confinement in New Jersey. *Clark*, 2020 WL 1446895, at *7. This would "both increase[e] the risk to them of contracting and spreading COVID-19 and further increase[e] the risk to the prison population when they return to the facility." *Id.*; *see* https://www.cdc.gov/coronavirus/2019-ncov/travelers/travel-in-the-us.html. Their release also may create new viral pathways between Defendants and those with whom they will reside.

**CONCLUSION**

For all of the reasons set forth above and expressed previously, the Government submits that the Court should deny Defendants request for release.

5